**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HANNAFORD BROS. CO. (T. R. Savage Division), Respondent.**

**No. 5382.**

United States Court of Appeals
First Circuit.

Dec. 11, 1958.

Rehearing Denied Jan. 6, 1959.

Hartigan, J., dissented.

Eugene Adams Keeney, Atty., Washington, D. C., with whom Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Asso. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty., Washington, D. C., were on brief, for petitioner.

Herbert H. Bennett, Portland, Me., with whom Mayo S. Levenson, Portland, Me., was on brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

We have before us a petition by the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., seeking enforcement of its order of December 18, 1957, against respondent. Hannaford Bros. Co., the respondent, is a wholesale grocery distributor. Its main office is located in Portland, Maine, but in October, 1955, it acquired through purchase the assets and business of T. R. Savage Co. of Bangor, Maine, and has since operated that business as a branch or division.

The Board's order required the respondent to bargain collectively with Local Union 340 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter referred to as the Union) as the exclusive representative of its employees working in the Bangor division, and to cease threatening economic reprisals if those employees joined the Union and promising economic benefits if the Union was repudiated. The Board found that the Company's letter of February 20, 1956, rejecting the Union's demand for recognition on the ground that the Bangor division was not an appropriate unit for collective bargaining and also on the ground that it doubted whether the Union represented a majority of the Bangor employees, was not written in good faith. The Board consequently concluded that respondent's refusal to bargain with the Union was an unfair labor practice under §§ 8(a)(5) and 8(a)(1) of the Act. It was further found by the Board that respondent had utilized the delay in negotiations to embark upon a campaign to undermine the Union by interrogating its employees concerning their Union activities, by threatening them with reprisals if they supported the Union, and by promising economic benefits in return for repudiation of the Union, thus committing additional unfair labor practices under § 8(a)(1) of the Act.

Counsel for respondent frankly stated that the evidence adequately warranted so much of the Board's order as was predicated upon a finding of various acts of interference by respondent's manager, in violation of § 8(a)(1). It is true that these acts of interference were unnecessary from respondent's point of view, and indeed illegal. But we think it is wholly illogical to infer from these acts of interference alone that the Company was also guilty of a refusal to bargain, in violation of § 8(a)(5), when it sent the letter of February 20, 1956, rejecting the Union's formal demand to be recognized as the exclusive bargaining representative of the employees in the Bangor plant. That rejection was predicated upon two grounds:

"First, we seriously question whether you do represent the majority of our employees in Bangor and, second, we do not consider Bangor as a separate unit but as part of the Company and we certainly know that you are not representing the majority of all of our employees. Under the circumstances, we prefer to wait for the decision of the National Labor Relations Board who now have that problem before them."

The reference in this letter to waiting for "the decision of the National Labor Relations Board" is to the fact that there was then pending before the Board, undecided, a representation proceeding instituted by petition of the Union dated January 16, 1956, in which the Union had claimed that a majority of the employees at Bangor had selected the Union as its bargaining representative, and that the Bangor Division constituted a separate "appropriate" bargaining unit; wherefore the Union asked the Board to conduct an election among the Bangor employees. The Company had opposed this petition upon the ground that the whole group of employees, both at Portland and at Bangor, constituted a single "appropriate" bargaining unit. Just before writing the letter to the Union of February 20, 1956, the Company had completed participation in three days of hearings held by the Board on that very question. Certainly there were rational grounds for this contention, and until it was resolved by decision of the Board, the Company was justified in its refusal to proceed on the contrary assumption, namely, that the Bangor plant itself was an appropriate bargaining unit.*

On April 12, 1956, the Board handed down its decision in this representation case, finding that the warehousemen, truck drivers and helpers at the employer's Bangor plant were a unit appropriate for the purposes of collective bargaining, within the meaning of § 9(b) of the Act, and directing an election to be held among the employees in such unit. This directed election has never been held, for the Union on February 17, 1956, filed with the Board its original charges of unfair labor practices which became the basis of the complaint filed by the General Counsel in the present case, No. 1-CA-2069-Bangor, and on July 6, 1956, the Board entered its order permitting the Union to withdraw, with prejudice, its petition in the pending representation proceeding.

In processing the instant complaint, in Case No. 1-CA-2069-Bangor, the Board found again that the employees at the Bangor plant constituted a separate appropriate unit for purposes of collective bargaining. On the basis of cards signed by a majority of the Bangor employees and held in the possession of the Union organizer, the Board found as a fact that the Union was the chosen bargaining representative of a majority of the employees in the appropriate unit. It also found as a fact that the two reasons advanced by respondent in its letter of rejection of February 20, 1956, were not made in good faith. Accordingly the Board concluded that the Company's letter of February 20, 1956, amounted to a refusal to bargain, in violation of §§ 8(a)(5) and 8(a)(1) of the Act.

We have already indicated the reasonableness of the Company's position in refusing to bargain separately with the Union as representing the Bangor employees until such time as the Board should determine the pending representation proceeding and should determine also whether the group of Bangor employees was a separate appropriate bargaining unit. We shall now say something about the Company's "good faith" in questioning whether the Union represented the majority of the employees even in the Bangor unit alone.

We do not say that the Board should never, in the absence of a secret election, determine that a majority of the employees in an appropriate unit have selected a particular labor organization as its bargaining representative. But we

---

* We think it hardly necessary to mention that the Board seems to have found some indication that the Company's claim of lumping together the employees at its Portland and Bangor plants into one all-inclusive unit was not made in "good faith", in that the Company continued to bargain collectively with a committee of its employees at Portland. There was no inconsistency here. The Portland committee was the bargaining representative of the employees at the Portland plant, as a result of a consent election conducted by the Board in June, 1955, in which the Union participated, and lost.

do point out that there is a vast difference between such a choice registered as a result of a secret ballot, and such a choice established by the introduction into evidence of signed cards, collected at the behest of the Union organizer.

In the present case there is no evidence that representatives of the Company ever saw these signed cards, or that there was any answer to the letter of February 20, 1956. There is no reason to doubt the finding by the trial examiner, which the Board accepted, to the effect that, prior to the writing of the letter of February 20, it had been reported to the Company management that a number of employees at the Bangor plant were dissatisfied with the Union, desired to defect from it, and intended to vote against it at the forthcoming election. There is no finding that this dissatisfaction was caused by the acts of interference, and indeed, in so far as the timing appears from the record before us, it seems to have arisen before the acts of interference. It is also undisputed that, at three Board-conducted elections which had been held at the Portland plant, in 1948 and again in 1955, this same Union had been rejected by a majority of the voters. On the basis of the evidence in the record as a whole, we think it obvious that the Company had every reason to doubt that the Union was the uncoerced choice of a majority of the employees in the Bangor plant.

The trial examiner argued that the Company, by its unlawful acts of interference, "had prevented the election from resolving the very issue on which Respondent purported to entertain doubts. Stated differently, Respondent's illegal conduct destroyed the efficacy of the very method whose outcome it insisted on awaiting." But it is not suggested that the Board has made an order for the interim recognition of the Union as an appropriate remedy for dissipating the adverse effects of the acts of interference, in violation of § 8(a)(1), until such time as a free election can be properly held. The Board has predicated its order to bargain collectively with the Union solely upon a finding that the Company had been guilty of an unfair labor practice of refusing to bargain collectively, in violation of § 8(a)(5), which finding we hold to be unsupported by substantial evidence on the record as a whole. Cf. N. L. R. B. v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; Franks Bros. Co. v. N.L.R.B., 1944, 321 U.S. 702, 706, 64 S.Ct. 817, 88 L.Ed. 1020.

Accordingly a majority of the court is of opinion that we should not enforce so much of the Board's order as is predicated upon a finding that respondent was guilty of unfair labor practices under §§ 8(a)(5) and 8(a)(1) of the Act, in that it had refused, on and after February 20, 1956, to recognize and bargain with the Union as the exclusive representative of its employees working at its Bangor warehouse.

A decree will be entered enforcing paragraphs 1(b) and 1(c) of the Board's order. With respect to subsection 2(b) of the order, requiring the posting of notices, we shall enforce so much of the order only as relates to the § 8(a)(1) violation by acts of interference. We shall also direct the Company to notify the Regional Director for the First Region, in writing, within fifteen (15) days from the date of the decree, what steps it has taken to comply therewith. The remainder of the order will be set aside.

HARTIGAN, Circuit Judge (dissenting).

In my opinion there is substantial evidence to support the Board's finding that there had been a violation of § 8(a)(5) by the Company.

Two reasons were advanced in the Company's letter of February 20, 1956 as grounds for its refusal to bargain with the Union. One is that it doubted that the Union represented a majority of the Bangor employees. The majority of the court indicates that the good faith of this ground is supported by the Board's finding that it had been reported to the Company management that a num-

ber of employees at the Bangor plant were dissatisfied with the Union, desired to defect from it, and intended to vote against it at the forthcoming election. But it is difficult to see how this defense can be asserted in good faith by an employer which by its unfair labor practices may well have caused a substantial number of these employees to become dissatisfied with the Union and thus cause it to lose its majority status as of February 20, 1956. It is well established that where the employer thwarts the possibility of a fair election, the Board has authority to require the employer to recognize a Union which clearly represented the majority of its employees prior to the initiation of unfair labor practices by that employer. National Labor Relations Board v. Warren Company, 1955, 350 U.S. 107, 76 S.Ct. 185, 100 L.Ed. 96; Franks Bros. Co. v. National Labor Relations Board, 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; National Labor Relations Board v. Idaho Egg Producers, 9 Cir., 1956, 229 F.2d 821; National Labor Relations Board v. Wheeling Pipe Line, 8 Cir., 1956, 229 F.2d 391; National Labor Relations Board v. Pyne Molding Corp., 2 Cir., 1955, 226 F.2d 818; National Labor Relations Board v. Armco Drainage & Metal Products, Inc., 6 Cir., 1955, 220 F.2d 573, certiorari denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; National Labor Relations Board v. Hamilton, 10 Cir., 1955, 220 F.2d 492; National Labor Relations Board v. Geigy Co., 9 Cir., 1954, 211 F.2d 553, certiorari denied 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647; National Labor Relations Board v. Kobritz, 1 Cir., 1951, 193 F.2d 8.

The second ground for refusal to recognize the Union set forth in the February 20, 1956 letter is based upon the Company's belief that its operations were such as to require a company-wide bargaining unit rather than separate bargaining units in Portland and Bangor. The Board's arguments that this defense per se was unreasonable and in bad faith are entirely unconvincing.[1] But on the other hand the Company by its coercion of its employees vitiated any standing which it had to assert this ground in support of its refusal to bargain. If the Company intended to rely in good faith upon the existence of a company-wide bargaining unit rather than individual plant units, there would have been no necessity for the Company to have indulged in the commission of coercive tactics aimed at dissuading its Bangor employees from support of a Union claiming a majority of only the Bangor plant employees.[2] Thus viewed in the context of this Company coercion, there would appear, in my opinion, substantial evidence that the Company had committed a violation of § 8(a)(5).

I would enforce the Board's order in its entirety.

On Petition for Rehearing

PER CURIAM.

A majority of the court is of opinion that the Board's petition for rehearing in this case is without merit, and should be denied.

Both the trial examiner and the Board applied in this case what appears to have been a rule of law that, because the time elapsing after the refusal to bargain was used by the Company for acts of interference, the refusal to bargain automatically and retroactively became an unfair labor practice. For example the trial examiner, whose opinion the Board adopted, stated that the facts which we held to be a basis for bona fide doubt "constituted no *defense* here, where the evidence established the actual fact of the Union's majority at the time of the request and established further * * * that Respondent

---

1. If there had been no other unfair labor practices, it is clear there would have been no violation of § 8(a)(5) by the Company in refusing to recognize the Union.

2. There were only thirty-seven employees at the Bangor plant as compared to approximately two hundred employees at the Portland plant.

was contemporaneously engaged * * * in a course of unfair labor practices which was obviously designed to procure the very renunciations and disavowals upon which Levenson purported to predicate his doubts. * * * But having embarked upon a campaign to destroy employee support for the Union through means proscribed by the Act, Respondent was *no longer entitled* to await the outcome of an election * * *." (Emphasis supplied.)

And the petition for rehearing frankly relies upon this ground:

"The first and third items might be germane to the Company's good faith, but our position * * * is that the Company has no standing to assert a good faith doubt of majority under these circumstances."

We found such a rule of law unsupported by logic or authority.

No doubt the acts of interference may be weighed as evidence bearing on whether the refusal was in good faith when made. But here no such weighing was made, nor, on the record as a whole, was this evidence substantial enough to support a finding of bad faith.

■ The Board now contends, in its petition for rehearing, that the reports of employee dissatisfaction were the result of the acts of interference. Not only is it inappropriate that this court, exercising a reviewing function, should supply a missing finding of fact; but also the record shows that at least the bulk of the acts of interference occurred on or after February 10, whereas the reports of dissatisfaction seem to have been made before that date. On this state of the record we clearly cannot supply the inference of an actual causal relation. Moreover, due to the Board's reliance on its asserted rule of law, such a causal relation—affecting only the *factual* question of good faith—would not be especially significant.

■ The court did not pass on the Board's finding that the Union had a majority in the week of February 16 to 22, or on the limits of the Board's remedial powers. Rather it is for the Board, not this court, to decide what order for bargaining, if any, is appropriate in light of an unfair labor practice consisting of acts of interference alone. To make our position clear in our main opinion, we noted that an order for bargaining might well be appropriate in such a case; on the other hand, the two and one-half years which have elapsed since the acts of interference may well have effaced all their effects. For this court to impose on the employees what might now be an unwanted representative in absence of a free election or a determination by the Board that such a remedy is necessary or appropriate in these circumstances would be a usurpation of the Board's function.

An order will be entered denying the petition for rehearing.

HARTIGAN, Circuit Judge, would grant the petition for rehearing.