**REILLY TAR & CHEMICAL CORPO- RATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15123.

United States Court of Appeals Seventh Circuit.

Nov. 17, 1965.

Carl T. Reis, Indianapolis Ind., White, Raub, Reis & Wick, Indianapolis, Ind., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas Canafax, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Atty., N. L. R. B., for respondent.

Before DUFFY, CASTLE and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

Petitioner seeks to review and set aside an order of the National Labor Relations Board issued against it and dated April 9, 1965.[1] In its answer, the Board has cross-petitioned for enforcement of its order.

The Board found petitioner had interrogated employees, threatening them with loss of benefits, and had unlawfully assisted employees in withdrawing their designation of a union as their bargaining agent, in violation of Section 8(a)(1) of the Act. The Board further found the Company had violated Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with a union which it knew represented a majority of its employees.

Petitioner, an Indiana corporation, with principal offices in Indianapolis, Indiana, is engaged in the production and sale of coal tar products, chemicals and preserved wood products.

In January 1964, at its Maywood plant, the Company not only employed 135 production and maintenance employees which the Oil, Chemical and Atomic Workers International Union, AFL-CIO, (Union) had represented for some two and a half years, but also five unrepresented laboratory technicians, who are the subject of this proceeding.

On January 19 and 20, four of the five laboratory technicians signed union cards. On January 21, the union's representative, Newman, sent a letter to C. A. Fisher, the Company's plant manager, in which he advised the Company that the union represented a majority "of the company's laboratory employees, excluding supervisors and chemists at the Maywood plant." He requested recognition of the union.

The Company did not make a written reply, but Newman and Fisher discussed the matter. Fisher stated he preferred an informal meeting to getting involved in a formal Board election proceeding.

On January 23 or 24, 1964, plant manager Fisher summoned all five laboratory employees, one at a time, to his office. At each conference, Laboratory Supervisor Colvin was the only other person present. Fisher asked each employee if he were "represented by the Union." Employee Skaggs said "No." The four others answered that they were.

During the interrogation, employee Stanley asked about the advantages and disadvantages of the union. Fisher told him if the union became accredited, the basis of pay would be changed from salary to hourly rates for the laboratory employees. In answering a question about promotions, Fisher explained that a non-union member would go further "because a union member had only so far he could go."

Several days before the union letter requesting recognition was received, Supervisor Colvin told Steele—"If we did have a union that he would automatically go off of salary and be placed on hourly basis. * * *" In a second conversation Colvin told Steele in the event there was a union, the rules would be strictly enforced and "that we'd have one coffee break in the morning and one in the afternoon, whereas now we can just about get coffee whenever we desire."

At about this same time, Colvin told laboratory technician Ruble that things were pretty lax in the laboratory and if the union came in, the office would have to make things pretty tight.

Employees Alvarez, Ruble, Stanley and Steele signed applications for membership in the union. On February 13, 1964, Alvarez Ruble, Stanley and Skaggs withdrew their applications under the following circumstances. Ruble asked Superintendent Colvin for a sheet of paper. Colvin was told Ruble and others wanted to withdraw from the union. Colvin spoke to Ruble and then reported to plant manager Fisher who proceeded to draft a withdrawal letter for Ruble and others

---

1. The decision and order of the Labor Board are reported at 151 N.L.R.B. No. 150.

addressed to the union with copies to the Company and to the Board. Colvin gave the draft to Ruble and supplied the paper and envelopes. Ruble started to type the letters of withdrawal in the payroll office where a typewriter was available. Not being an efficient typist, he turned the task over to Stanley. Superintendent Colvin bought three stamps and made a trip to the drugstore to buy plain envelopes. He then took the letters to the postoffice because the employees wanted the copies which were sent to the regional office to be received there on the next day.

On February 14, the union filed an unfair labor practice charge alleging that on January 6 and thereafter, the Company had unlawfully interrogated employees concerning their union activities. The representation hearing opened the same day. The union requested an amendment to its petition to state that they were seeking to represent the laboratory employees in a separate appropriate unit. Prior thereto, the petition had stated that the employees in the unit involved would be placed in the production and maintenance unit which the union already represented.

The Board does not have a very strong case with reference to the charge of coercive interrogation of employees. Most of the statements relied on by the Board were made in reply to questions from the employees. However, we must and do hold that there is substantial evidence in the record, considered as a whole, which supports the Board's findings that the Company interfered with, restrained and coerced its employees in violation of Section 8(a) (1) of the Act.

The Board has even a weaker case as to its charge that the Company violated Section 8(a) (5) and (1) of the Act, by refusing to recognize and bargain with a union which it knew represented a majority of the employees concerned. We do not think that there is substantial evidence in the record, considered as a whole, to support this charge. The burden of proof was upon the Board.

In this case, we have no showing of any anti-union bias on the part of the employer. For two and a half years, a union had been representing a large proportion of the employees. As far as this record shows, this relationship had been amicable.

We are here concerned with only five laboratory employees. The union itself was uncertain as to the proper bargaining unit. The representation petition stated that the laboratory employees would be placed in the existing production and maintenance unit. However, at the representation hearing, the union changed its view.

Furthermore, it is certain that three of the five employees with whom we are here concerned, desired to withdraw from the union. They were quite determined in this respect. Furthermore, there are rather strong indications that the union did not want an election so that the laboratory employees could make a choice by secret ballot.

It is true that four of the five employees did sign union cards, but as was said in N. L. R. B. v. Hannaford Bros. Co., 1 Cir., 261 F.2d 638, 641—"[T]here is a vast difference between such a choice (of a union) registered as a result of a secret ballot, and such a choice established by the introduction into evidence of signed cards, collected at the behest of the Union organizer."

We conclude the evidence does not support the charge that the Company violated Section 8(a) 5 and (1) of the Act by refusing to bargain with a union which it knew represented a majority of the laboratory employees.

The order and the notice of the Board will be amended to eliminate any reference to a violation of Section 8(a) (5) of the Act; otherwise, the order of the Board will be

Enforced.

SWYGERT, Circuit Judge (dissenting in part).

On January 19 and 20, 1964, four of the five laboratory technicians signed

union cards. On January 21, the union informed the company that it represented a majority of these employees and requested recognition. The company made no written reply but proceeded to question each of the employees. It thereby verified the fact that a majority of the laboratory technicians were represented by the union. The company did not comply with the union's request for recognition despite this verification. Instead, its superintendent, in conversation with two of the technicians, alluded to disadvantages which would follow from union accession. The union, having received no reply to the request for recognition, filed a petition with the Board for an election. Shortly thereafter, the four employees who had signed union cards wrote letters to the union, with the assistance of company superintendent Colvin, indicating their withdrawal.

I am of the opinion that the failure of the company to comply with the request to bargain with the union after it had learned of the union's majority status, the subsequent statements of the company superintendent to the employees, and the assistance given to the employees in submitting their withdrawals from the union in their totality constitute substantial evidence of a refusal to bargain within the meaning of section 8(a) (5). Once having ascertained that a union represents a majority of the employees, an employer may not delay in complying with a request to bargain until the majority status has been erased, particularly when the employer himself has contributed to such effacement. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 679, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944)

The court's opinion attaches some significance to the union's change of view with respect to the appropriate bargaining unit and also to the fact that this case concerns only five employees. It is true that the union's initial request for representation contemplated a separate unit restricted to the laboratory tech-

nicians and that its representation petition requested that the technicians be merged with the existing production and maintenance unit. The company, however, made no objection about the appropriate unit. Its refusal to bargain did not stem from any bona fide doubt on that point. Therefore, the union's change of view is wholly immaterial to the issue before us. Also immaterial is the fact that this case is concerned with a very few employees. The National Labor Relations Act makes no distinction regarding the number of employees whose rights must be affected in order to apply its safeguards.

I would enforce the Board's order in its entirety.