**PHELPS–DODGE COPPER PRODUCTS CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15187.

United States Court of Appeals Seventh Circuit.

Dec. 10, 1965.

Howard P. Robinson, William P. Richmond, Chicago, Ill., for petitioner, Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Atty., N. L. R. B., Washington, D. C., for respondent.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court upon the petition of Phelps-Dodge Copper Products Corporation to review and set aside, and upon the cross-petition of the National Labor Relations Board to enforce, an order of the Board issued against the Company. The Board's decision and order are reported at 152 NLRB No. 119.

The Board found that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act by refusing to recognize and bargain with the Union,[1] and by attempting to dissuade the employees from supporting the Union by dealing directly with them instead of their chosen representative in regard to changes in conditions of employment, interrogating them about their designation of the Union and holding out to them the prospect of holiday pay and wage increases, and by interrogating employees as to whether they had signed Union authorization cards. The Board's order requires the Company to cease and desist from the unfair labor practices found, and from in any like or related manner interfering with, restraining or coercing employees in the exercise of rights guaranteed in Section 7 of the Act. Affirmatively, the Board's order requires the Company to bargain with the Union upon request, and to post designated notices.

Consistent with the guiding principles furnished us by Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, our examination of the record convinces us that we "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial, when viewed in the light that the record in its entirety furnishes, * * *".

The record, as it finally developed, discloses that the unit actually involved consists of five warehousemen employed at the Company's Melrose Park, Illinois, warehouse. On July 21, 1964, each of these five employees signed an application for membership in the Union, an authorization for check-off of dues, and an authorization for the Union to represent him in collective bargaining. But the Union's demand for recognition and the opening of contract negotiations asserted that "our union currently represents all of your warehouse employees who are in your employ in a non-supervisory non-clerical capacity". The Company not only operated warehouses at other locations but at the Melrose Park warehouse there were other employees, performing various jobs, in addition to the five "warehousemen". Moreover, the Union's demand was in the form of a letter addressed under date of July 23, 1964, to one Dwight Palmer at the Melrose Park location. Palmer was a District Manager in charge of sales. He had no authority or control over Company policy concerning the wages, hours, or working conditions of the warehousemen. Leroy Born was the local operations manager of the Melrose Park warehouse, but the general manager of all of the Company's warehouses, and the vice-president having final authority concerning labor relations, were located at the home office in New York. The letter was received by Palmer on July 24, a Friday, and was brought to Born's attention after he returned from vacation on July 27, 1964. Born's inquiries addressed to employees as to whether they had signed union authorization cards met with no direct response except by one employee who denied he had signed such a card. A second letter, also addressed to Palmer, indicated that the Union was aware that "you may not be in a position to make the decision without consultation with your home office". This letter was received by Palmer on Friday, July 31, 1964. But on Monday, August 3, 1964, the Union filed a refusal to bargain complaint with the Board. In the interim, between July 28 and August 3, three of the five employees who had signed authorization cards visited the Union office and left word that they no longer desired union affiliation. This was after employee Broussard had advised Union organizer Pniewski by telephone that the men had changed their minds and were no longer interested in the Union. Pniewski said that it was too bad but there was nothing he could do about it. Only two of the employees, Broussard and Scott, were called by the General Counsel to testify. Both had signed cards but, along with

1. United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO.

employee Romig, had attempted to withdraw their authorizations.

The precipitate action of organizer Pniewski was, in our view, unreasonable on the facts and circumstances here involved. The ambiguity in the extent of the unit for which representation was claimed fully justified a good faith doubt on the part of the Company. And, before it was able, due in part to the Union's instructions to the employees not to say anything about signing the cards, to verify either the unit involved or the existence of a majority, the Union had lost the support of the employees unaffected by any action on the part of the Company. When Born questioned the employees concerning their execution of the authorization card he did so under circumstances which negate coercion, or threats or promises which would constitute interference with the employees' rights. The two employees singly questioned were merely asked if they signed cards. And, in the subsequent meeting with the group of employees, nothing occurred which might be construed as an interference with the employees' Section 7 rights. When a spokesman for the employees volunteered that the employees "felt that they got a bad deal" in not receiving holiday pay for three holidays that had fallen on Saturday, and that "wages were a little low and raises a little hard to come by", Born made no promise concerning these subjects. He merely stated that he felt they were justified in the holiday pay complaint—as he had previously advised them—and that he would continue to fight to get this pay for all of the employees, including the office help and that increases were being worked on.

It was not until after the crucial period here involved, and sometime in August, that a mistake which had been made in the holiday pay—due to a misunderstanding of a Company directive—was rectified, and the employees paid for the three past holidays involved. And the five cent an hour pay raise which followed was in accord with standing Company policy based on comparable wages paid by competitors in the area. There is nothing in the record to indicate that the Company's action with respect to either of these matters could have had any effect on influencing the employees concerning affiliation with the Union. They occurred subsequent to the Union's loss of a majority in what turned out to be the five man unit involved.[2] And no promise or threat concerning these matters or other conditions of employment had occurred at any time relevant to the employees' selection or rejection of the Union.

We are convinced that the Union, once it realized it had lost support of a majority of the five employees actually involved, sought through the pressure of precipitate action to force recognition by the Company despite the contrary wishes of the employees. We perceive no basis, in the face of the particular circumstances here involved, for a finding of bad faith on the part of the Company. There was ambiguity in the unit claimed, Union inspired deceit in the employees' refusal to admit or deny the signing of the authorization cards, and upon loss of majority support a resort to unreasonably precipitate action in what appears to have been an effort to force recognition on the basis of the previously signed authorization cards irrespective of the current desires of the employees involved. If any bad faith is shown it is on the part of the Union.

Here, as in Reilly Tar & Chemical Corporation v. N. L. R. B., 7 Cir., (opinion filed November 17, 1965) 352 F.2d 913, five employees did sign union application cards, but as observed by Judge Duffy in that case, there is a vast difference between the choice of a union registered as a result of a secret ballot, and such a choice established by the introduction into evidence of signed cards collected by a union organizer. In Reilly this Court refused to enforce a recognition and bar-

2. The unit was more definitely described in the charge filed with the Board so as to eliminate the possible inclusion of employees other than warehousemen.

gaining order where a majority of the five man unit desired to withdraw from the Union after they had signed authorization cards, although the Court did enforce that part of the Board's order based on its finding that the employer did interfere with, restrain and coerce the employees in violation of Section 8(a)(1) of the Act. In the instant case the position of the Board is much weaker—no factor of interference, restraint or coercion being reflected by the record.

The petition to set aside the Board's order is granted; and enforcement thereof is therefore denied.

Order set aside and enforcement denied.