NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

S. S. LOGAN PACKING COMPANY,
Respondent.

No. 10355.

United States Court of Appeals
Fourth Circuit.

Argued May 5, 1966.

Decided Oct. 27, 1967.

Peter Ames Eveleth, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Elliott Moore, Atty., N. L. R. B., on brief), for petitioner.

C. Robert Schaub and John E. Jenkins, Jr., Huntington, W. Va. (Jenkins, Schaub & Fenstermaker, Huntington, W. Va., on brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and J. SPENCER BELL,* Circuit Judges.

HAYNSWORTH, Chief Judge:

Resolving the principal question presented, we decline enforcement of an order of the National Labor Relations Board requiring an employer to bargain with a union, for neither the finding that the union represented a majority of the employees, nor the finding that the employer had no good faith doubt of it has evidentiary support in the record. The order will be enforced insofar as it proscribes unlawful interrogation of employees and surveillance of their union activities.

Food Store Employees Union, Local No. 347, an affiliate of Amalgamated Meat Cutters and Butcher Workmen of North America, sought to organize the employees of S. S. Logan Packing Company, a wholesale processor and dis-tributor of meats in Huntington, West Virginia. Four years earlier a consent election had been held which the union lost. This time, it sought to obtain signed authorization cards from a majority of Logan's employees, and, when it thought they were in hand, a letter was written to the employer in which it was stated that the union represented a majority[1] of the employees. The letter expressed the union's willingness to submit the cards to "a neutral party" for a check against payroll records. A bargaining conference was requested.

Receipt of the letter was acknowledged in the absence of Logan's president with a statement that it would be brought to his attention upon his return. Several days later a representative of the union telephoned Mr. Logan, and was told by Logan that he was not in a position to give an answer, but would respond in a few days. That conversation was followed on March 10, six days later, by a letter in which it was stated on behalf of the union that, unless an affirmative response was in hand by March 12, charges of violations of §§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act would be filed.

The employer responded on March 12 by filing a formal charge of coercive practices by the union in the use of threats to obtain signatures to authorization cards.[2] The union countered with charges of violations of §§ 8(a) (1) and 8(a) (5) of the Act, and a complaint issued on these charges.

At the hearing authorization cards purportedly signed by forty-three Logan employees were received in evidence. This was found to be "a clear majority" of the eighty employees in the unit, if the unit included truck drivers and driver salesmen, as the employer contended and as agreed upon for purposes of the

---

* Judge Bell participated in the hearing of this case, but died before the opinion was prepared for submission to him.

1. There was no specification of the size of the majority.

2. The Regional Director refused to issue a complaint on these charges, and the Board's Office of Appeals dismissed Logan's appeal. These charges have a bearing, however, on Logan's good faith in withholding recognition.

earlier consent election.[3] All of the authorization cards were dated on or before February 24, when the union's first letter was written.

Evidence was also introduced indicating that, in early March, Logan had inquired of three employees whether or not union organizers had called upon them at their homes. A fourth was told by Logan that Logan had heard that organizers had visited his house. No one of the four was asked about signing a card or about his support of the union. One of them, however, was asked about his brother's[4] attitude toward the union, and a second one was told by Logan that, if the union got in, it would "ruin us."

There was also evidence that on two occasions in March Logan's son visited a restaurant, frequented by employees at lunchtime, when union organizers were present. One of the visits was on Logan's orders after the receipt of a telephone call from the restaurant. The son testified that each visit was for the purpose of extending requested protection from the badgering of the organizers to an employee, who left with him on both occasions.

■ At this point we may interpolate that the evidence, while very minimal, was enough to support the findings of § 8(a) (1) violations. Asking one employee about the attitude toward the union of his brother and fellow employee was improper in the absence of a legitimate purpose and appropriate explanation. Telling another that Logan had heard that organizers had visited him may have had as its purpose the creation of an impression of the existence of a system of informers or surveillance. The concurrence of the telephone call and the order to the son to get his lunch at that particular restaurant that day clearly justifies an inference of surveillance. Neither the first amendment nor § 8(c) lends protection to coercive interrogation or surveillance.[5]

Rejected at the hearing were affidavits by four employees that union organizers had sought to obtain their signatures on authorization cards by threats of job loss when the union obtained recognition or, without recognition, by exercise of a claimed right to require Logan's chain store grocery customers to cease doing business with Logan. The affidavits were thought to be irrelevant because each of the four had persisted in refusing to sign the cards, despite the threats. They were also thought to be inadmissible because the employees, themselves, were not offered as witnesses. The bearing of the affidavits, taken in March, upon the employer's opinion of the extent of voluntary support for the union among the employees was unnoticed.

On that evidence, the Trial Examiner recommended and the Board found that the union represented a "clear majority" of the employees on February 24 and that the employer had no "good faith doubt" of it. The Board ordered the employer to bargain with the union.

■ We deal with the rights of employees. Under § 7 of the Act, they are guaranteed the right to choose their representatives and, under the Taft-Hartley amendments of 1947, a rejection of representation is a concomitant right, guaranteed by the statute, of equal rank and dignity with the right to select a union. Under § 9 and implementing decisions, there are elaborate processes and rules to insure that the choice of the employees is truly free and unfettered. There must be a secret ballot, so that each employee may express his true conviction free of any concern that employer, union, or others to whom he may have made a commitment, or of whom he may feel in awe, will know his true feel-

3. It was a somewhat clearer majority of the seventy-two employees in the unit, if the truck drivers and driver-salesmen were excluded, as the union requested in its initial letter and at the hearing, the unit found appropriate by the Board.

4. The brother was also an employee.

5. See NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348.

ing. Conduct which seriously impairs the "laboratory conditions" under which such elections are to be held will result in their invalidation and new elections.[6]

In stark contrast is a decisional rule that bypasses the election processes and places signed authorization cards on a parity with an affirmative vote in a secret election.[7]

It would be difficult to imagine a more unreliable method of ascertaining the real wishes of employees than a "card check," unless it were an employer's request for an open show of hands. The one is no more reliable than the other. No thoughtful person has attributed reliability to such card checks. This, the Board has fully recognized.[8] So has the AFL–CIO.[9] In 1962, Board Chairman McCullock presented to the American Bar Association data indicating some relationship between large card-signing majorities and election results.[10] Unions which presented authorization cards from thirty to fifty per cent of the employees won nineteen per cent of the elections; those having authorization cards from fifty to seventy per cent of the employees won only forty-eight per cent of the elections, while those having authorization cards from over seventy per cent of the employees won seventy-four per cent of the elections. This suggests that the greater the majority of authorization cards, the greater the like-

lihood of a union election victory, but, obviously there are exceptions. Though ninety per cent of the employees may have signed cards, a majority may vote against the union [11] in a secret election. Overwhelming majorities of cards may indicate the probable outcome of an election, but it is no more than an indication, and close card majorities prove nothing.

The unsupervised solicitation of authorization cards by unions is subject to all of the criticisms of open employer polls. It is well known that many people, solicited alone and in private, will sign a petition and, later, solicited alone and in private, will sign an opposing petition, in each instance, out of concern for the feelings of the solicitors and the difficulty of saying "No." [12] This inclination to be agreeable is greatly aggravated in the context of a union organizational campaign when the opinion of fellow-employees and of potentially powerful union organizers may weigh heavily in the balance.

That is not the most of it, however. Though the card be an unequivocal authorization of representation, its unsupervised solicitation may be accompanied by all sorts of representations.[13] "We need these cards to get an election.[14] You believe in the democratic process, don't you? Do you want to deny people the right to vote? Isn't it our American

---

6. See, e. g., NLRB v. Trancoa Chemical Corp., 1 Cir., 303 F.2d 456, 3 A.L.R. 2d 879; NLRB v. Lord Baltimore Press, Inc., 4 Cir., 300 F.2d 671; Anchor Mfg. Co. v. NLRB, 5 Cir., 300 F.2d 301.

7. NLRB v. Hannaford Bros. Co., 1 Cir., 261 F.2d 638, 641.

8. Sunbeam Corp., 99 NLRB 546, 550–551; Midwest Piping & Supply Co., 64 NLRB 1060; Novak Logging Co., 119 NLRB 1573.

9. AFL-CIO Guidebook for Union Organizers (1961), 190, quoted in Senate Hearings on § 14(b).

10. 1962 Proceedings: Section of Labor Relations Law, American Bar Association 14–17.

11. When lines of communication become blocked, when employees think there is

no right of appeal beyond a foreman's decision, frustrations mount quickly. In such circumstances an almost universal feeling of the need for unionization can build up swiftly and be as swiftly dissipated by an unblocking of the lines of communication.

12. See, e. g., recognition in the Organizer's Guidebook, supra, n. 9, of the fact that some cards are signed to "get the union off my back."

13. See, e. g., NLRB v. Southbridge Sheet Metal Works, Inc., 1 Cir., 380 F.2d 851; NLRB v. Nichols Co., 2 Cir., 380 F.2d 438.

14. Indeed they do, for a show of strength has been required to get an election. NLRB v. Swift & Co., 3 Cir., 294 F.2d 285, 288. See 29 U.S.C.A. § 159(c) (1).

way to resolve questions at the polls? Do you want to deprive us of that right? Are you a Hitler or something?"

As the affidavits tendered by the employer in this case indicate, unsupervised solicitation of cards may also be accompanied by threats which the union has the apparent power to execute. Few employees would be immune from a frightened concern when threatened with job loss when the union obtained recognition unless the card was signed. Whether or not the organizers could ever obtain the power to procure the discharge of uncooperative employees is beside the point as long as they claim the power and the employee is without a basis for a firm disbelief of it. On a similar plane stand the reported assertions that the union had a right to require Logan's customers to cease doing business with it and thus to destroy Logan's business, and the threat that the right would be exercised if Logan's employees did not join the union. An employee might distrust the organizer's claim, but without a basis for its clear refutation, he cannot escape its influence.

Without adequate supervision, solicitors of authorization cards may resort to a wide variety of other threats. Discrimination in the exaction of initiation fees is frequently encountered,[15] and, particularly where untrained fellow-employees are used as solicitors, use of threats of discrimination against non-signers in the compilation of seniority rosters and other conditions of employment may be a strong temptation.

The unreliability of the cards is not dependent upon the possible use of misrepresentations and threats, however. It is inherent, as we have noted, in the absence of secrecy and in the natural inclination of most people to avoid stands which appear to be nonconformist and antagonistic to friends and fellow employees. It is enhanced by the fact that usually, as they were here, the cards are obtained before the employees are exposed to any counter argument[16] and without an opportunity for reflection or recantation. Most employees having second thoughts about the matter and regretting having signed the card would do nothing about it; in most situations, only one of rare strength of character would succeed in having his card returned or destroyed. Cards are collected over a period of time, however, and there is no assurance that an early signer is still of the same mind on the crucial date when the union delivers its bargaining demand.

For such reasons, a card check is not a reliable indication of the employees' wishes.[17]

An employer could not help but doubt the results of a card check as an indication of the wishes of employees, for there is nothing in the process to allay it. Unless the employer is extraordinarily gullible and unimaginative, he will at least suspect unreliability in the cards and their signatures. If he has no honest doubt of the union's claim of support by a majority of the employees, it will be because of other evidence known to him, not because of the card check.[18] That

---

15. See NLRB v. Gorbea, Perez & Morell, S.En C., 1 Cir., 300 F.2d 886.

16. In an election, of course, the Board goes to great pains to see that a union has adequate access to employees. It now requires the employer to furnish a list of employees with their home addresses (see Excelsior Underwear, Inc., 156 NLRB 1236), so that the union's distribution of campaign literature can be as effective as the employer's. The objective is to assure exposure of each employee to *both* sides of the issue, not just one, so that his choice when the

ballot is cast may be as reasoned and rational as possible.

17. See, Note, Union Authorization Cards, 75 Yale L.J. 805, 823–28 (1966).

18. See, e. g., Bilton Insulation, Inc. v. NLRB, 4 Cir., 297 F.2d 141, where the conduct of the employees in the plant in open advocacy of the union left no room for doubt of their wishes, and Florence Printing Co. v. NLRB, 4 Cir., 333 F.2d 289. As the latter case discloses, too, a belated assertion of unspecific doubt is entitled to little weight when the bargaining request was rejected not on the

doubt will be greatly reinforced if the employer has information of abusive conduct by card solicitors, as the employer here did. It matters not that his information came from four employees who refused to succumb in face of the alleged threats. If threats were employed ineffectually upon the four, there is a natural inference that they were effectively used to obtain the signatures of others with lower powers of resistance, and those intimidated by the threats are not likely to go babbling about it to the employer.

Here, of course, there was some prior history to add to the employer's doubt of the union's claim. Four years earlier, the union had claimed to represent a majority of the employees, but, thereupon, lost a consent election, the validity of which is unchallenged. The proffer of a card check gave the employer no reason to attribute greater credence to the claim of majority representation than to the similar claim which the employees refuted in the secret, consent election four years earlier. Use of cards by unions has been traditional in assessing and recording the progress of organizational efforts; the only difference was that now the union sought, not an election, but recognition based solely upon a third party's check of the cards against payroll records.[19] Moreover, before expiration of the union's deadline for the employer's response, the employer had received information of coercive practices in the card solicitation, for on that day it filed formal charges to that effect and, at the hearing, backed them up with supporting affidavits from four employees.

All of the specifics in this record tend to enhance rather than diminish, the employer's doubt of the union's claim. If

Logan had any information tending to support the union's claim it is not disclosed on this record.

The situation is not altered by the Board's finding, which we have accepted, of minimally coercive questioning and surveillance of employees after the demand for bargaining, for such conduct has no relevancy to the § 8(a) (5) issues.[20]

If, upon receipt of a union's claim of a majority and a demand for recognition, an employer does nothing, his inaction may be some indication that he has no doubt of the union's majority status. It would be no more than an indication, of course, because he might want the union in or, though quite unlikely, be completely indifferent to it, or it may be that his inaction is a result of indecision or fear of unfair labor practice charges as a consequence of affirmative conduct. The natural response of an employer entertaining real doubt of the union's claim is an affirmative, investigatory one. The doubting employer, seeking to inform himself, will turn to interrogation, though there was precious little of it here, and, possibly to surveillance. He, technically, has a right to interrogate for the purpose of resolving his doubt, but no inquiry can be limited to a search for answers to the one question, "at any time on or before the date of the bargaining demand, have you signed a union authorization card?" Affirmative answers must be probed more deeply, if the investigation is to have a semblance of adequacy. An adequate investigation must include questions designed to disclose the possible presence of threats or misrepresentations and of subsequent attempts at revocation.[21] When the interrogation is designed to expose all of the circumstances sur-

---

basis of any doubt that the union represented 14 of the 19 employees but on the basis that the employer would sign no union contract. At the time, the employer conceded the union's claim.

19. In such a procedure, there is not even assurance that each card was actually signed by the person whose purported signature it bears.

20. NLRB v. Hannaford Bros. Co., 1 Cir., 261 F.2d 638; accord, Reilly Tar & Chem. Co. v. NLRB, 7 Cir., 352 F.2d 913. See Phelps Dodge Copper Prod. Corp. v. NLRB, 7 Cir., 354 F.2d 591.

21. Such an investigation was made, and found not to be coercive, in NLRB v. Johnnie's Poultry Co., 8 Cir., 344 F.2d 617.

rounding the card signing, it approaches so perilously close to the employee's real wishes, that the interrogator may well overstep the narrow bounds; he certainly will expose himself to the grave risk of unfair labor practice charges which, on the basis of conflicting recollections, the Board may sustain. In the colorful language of Judge John R. Brown,[22] referring to such an employer:

"* * * But like Odysseus, he stands almost helpless as he makes the perilous passage between Scylla and Charybdis. If he makes a simple inquiry of each employee and accepts the simple answer, the very pressures apprehended may well bring about the employee's confirmation as well. If he probes deeper, the inquiry unavoidably becomes an investigation and soon it is inescapable that there be insinuations or intimations in terms of relative evaluation of union or non-union conditions. At that point, undefined and undefinable, the inquisitor trespasses either on forbidden ground or flounders in the Serbonian bog * * * surrounding it so that what started out to be a means of compliance with law is turned into an affirmative charge of an unfair labor practice. And all the while, all that is done, all that is said, all that is asked, all that is answered, rests in the uncertain recollection of the partisan participants. What begins as the employer's quest now ends in the employer's flight. And now no longer will his conduct be judged alone by what was said. Now, through the unavoidable nature of our legal administrative machinery, * * * it will be judged by what interested partisans say one said was said, or what others said to have said say was said."

A finding of a § 8(a) (1) violation out of such investigatory conduct of an employer tends to confirm his claim of a good faith doubt of the union's majority; it has no tendency to negate it. More extreme conduct, at most, is a neutral item of evidence, for no employer strongly opposed to the union will wait until he is convinced the union has obtained a majority. He will react promptly upon learning of the organizational campaign, and he is not likely to act less aggressively if he thinks the union is about to obtain a majority than if he thinks it already has. Extreme cases can be imagined in which particular conduct may support other inferences, as when an employer abruptly discharges a majority of his employees, card signers all. But in typical cases, subsequent unfair labor practices have a tendency to prove only the employer's opposition to the union's organizational effort; they throw no light on his belief or disbelief of the union's claim of majority status.[23]

This record, therefore, contains no reliable evidence that the union ever represented a majority of the employees, and there is no evidentiary basis for a rejection of the employer's claim of good faith doubt of it.

There remains, however, a question whether an employer, who commits an unfair labor practice after receipt of a bargaining request, may be precluded, as a matter of law rather than of factual inference, from asserting a good faith doubt of the union's claim of majority status, that is, whether, under such circumstances as these, the Board has the power to impose a bargaining order as an appropriate remedy for violations of § 8(a) (1). We find no legal basis for such an order in a case of this kind.

The National Labor Relations Act provides in § 9(a) that representatives designated or selected for the purpose of collective bargaining by a majority of employees in an appropriate unit shall be the

**22.** NLRB v. Dan River Mills, 5 Cir., 274 F.2d 381, 388–389.

**23.** It has frequently been suggested that a violation of § 8(a) (1) or § 8(a) (3), committed after the bargaining demand is a refutation of any good faith doubt of the union's claim of majority status. See, e. g., NLRB v. Overnite Transportation Co., 4 Cir., 308 F.2d 279. The suggestion has not been accompanied by analysis, and analysis does not support it, if the question is a factual one. See *Hannaford Bros.*, supra n. 20.

exclusive collective bargaining representative for all employees in the unit, and § 9(c) provides for a secret election under Board supervision as the exclusive method of resolving a question concerning representation. As originally enacted, however, § 9(c) permitted the Board to employ "any other suitable method" to settle representation questions. Until adoption of the Taft-Hartley amendments in 1947, therefore, the Act permitted the Board to decide representation questions by considering evidence of majority status, without an election. In that process card counts were utilized.[24]

It has always been true, too, that the duty to bargain is not dependent upon a Board certification under § 9(c). An employer believing an independent union represents a majority, may recognize it, unless there are two competing unions each claiming a majority.[25] The duty to bargain follows from recognition. Without recognition, it arises if recognition is wrongfully withheld when the union clearly represents a majority of the employees and the employer has no doubt of it, and in such a case there is no question of representation for the Board to resolve.[26] The duty to extend recognition and to bargain when there is no question concerning representation is settled under the Act in its present form[27] as it was under the original Wagner Act.[28] A question concerning representation exists, however, when a determination of the union's status and the employer's doubt of it is dependent upon a choice of dubious or debatable inferences arising from disputable, or even undisputable, evidentiary facts.

Without regard to that distinction and with no reference to the change wrought by Taft-Hartley, bargaining orders have been enforced in recent years on the authority of cases decided under the Wagner Act before the 1947 amendment.[29] Those which are not supportable on the basis of the absence of any litigable factual question concerning representation should, at the very least, have taken note of the 1947 amendments, but, oddly, none of them have. Cases holding that a refusal to bargain is a violation of § 8(a) (5) when there is no question of representation have been lumped with cases construing the original Wagner Act's § 9(c) to enforce bargaining orders without regard to the essential predicates of the earlier decisions. One court has even held that the one year ban on new elections does not apply to a show of cards within twelve months after a union has lost a valid, Board-supervised election.[30]

Without reference to the current statutory provisions, however, such decisions lack persuasive impact. Congressional enactments may not be ignored by judges, and an indiscriminate confusion of two principles of discriminate application ought to be avoided.

That the Taft-Hartley amendments did restrict the Board to the use of secret ballots for the resolution of representation questions seems plain enough. They specifically repealed that part of § 9(c) which had authorized the Board to employ "any other suitable method" of resolving such questions, leaving a secret election as the sole basis of a certification. They also extended to an employer the right to petition for an elec-

24. E. g., Franks Bros. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; Joy Silk Mills, Inc. v. NLRB, D.C.Cir., 185 F.2d 732.

25. When there are two competing unions claiming majority representation, the employer commits an unfair labor practice if he recognizes one even though it holds signed authorization cards from a majority of the employees. International Ladies' Garment Workers Union, AFL-CIO, v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762, aff'g 280 F.2d 616.

26. See NLRB v. Sehon Stevenson & Co., Inc., 4 Cir., 386 F.2d 551 (decided this day).

27. United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941.

28. Franks Bros. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020.

29. See, e. g., NLRB v. Trimfit of Calif., Inc., 9 Cir., 211 F.2d 206; Joy Silk Mills, Inc. v. NLRB, 185 F.2d 732.

30. Conren, Inc. v. NLRB, 7 Cir., 368 F.2d 173.

tion after receipt of a bargaining demand, though only one union was involved.[31] It was made plain in the Committee reports,[32] however, that an employer, after receipt of a demand to bargain from a union claiming to represent a majority of the employees, need not petition for an election. He had the alternative of waiting for the union to invoke the Board's election processes, but he was assured of an election on his own petition if the union sought to obtain recognition by means other than an election. There was a minority report,[33] but it questioned none of this; it objected only to the absence of express authority in the Board to dismiss an employer's election petition if there were no doubt that an established, recognized union still represented a majority of the employees. The statute was enacted without language giving the Board the very limited discretion the minority thought it should have.[34]

The statutory scheme is not unreasonable. There are expressions of concern that an employer by unfair labor practices may dissipate a union's majority before an election can be held, but Logan's very minimal infractions here could have no substantial effect upon an election. Much more serious misconduct may help, rather than hurt, the union's chances,[35] and in the great majority of cases, a cease and desist order with the posting of appropriate notices will eliminate any undue influences upon employees voting in the security of anonymity. In such cases, with the assistance, when appropriate, of remedial orders for violations of § 8(a) (1) and §

8(a) (3), the electoral process retains a high degree of reliability and integrity, while card counts acquire neither.

It has been suggested that bargaining orders may hasten the commencement of collective bargaining, but that is an obvious fallacy as long as bargaining orders encounter the sort of employer resistance they have met. Had Logan been charged only with violations of § 8(a) (1), it might well have agreed to desist and to post an appropriate notice. If it did not, the case would not have occupied so much of the time of the Board as this one did, and it is most improbable that it would have ever reached this court. Had that course been followed, a reliable election could have been held long ago. If the union had a majority, the bargaining order has substantially postponed, not hastened, the commencement of bargaining, and that is the likely consequence in every case.

 In those exceptional cases where the employer's unfair labor practices are so outrageous and pervasive and of such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had, the Board may have the power to impose a bargaining order as an appropriate remedy for those unfair practices.[36] Then it is imposed without need of answering the question whether the union ever obtained majority status. The remedy is an extraordinary one, however, and, in light of the guaranty of § 7 of employees' rights not to be represented,

31. 29 U.S.C.A. § 159(c) (1) (B).

32. S.Rep. No. 105, 80th Cong., 1st Sess., Part I, p. 25 (1947); H.Rep. No. 245, 80th Cong., 1st Sess., p. 35 (1947).

33. S.Rep. No. 105, 80th Cong., 1st Sess., Part II, p. 11 (1947).

34. See, generally, Note, 75 Yale L.J. 805, 820, supra n. 17. In its Annual Report for 1948, the Board at page 32 expressed its unequivocal agreement with our construction of the effect of the amendment of § 9(c) of the Act. It stated:

"Section 9(c) of the Act, as amended, prescribes the election by secret ballot as the sole method of resolving a question concerning representation, and leaves the Board without the discretion it formerly possessed—but rarely exercised—to utilize other 'suitable means' of ascertaining representatives."

35. See Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 40 (1964).

36. See Bok, supra n. 35 at pp. 132–139.

its use, if ever appropriate, must be reserved for extraordinary cases.[37]

The issue in this case was a routine representation question. It should have been handled as such by the Board and resolved in an election under the Board's supervision. It cannot be fairly said that no such question was present, for the facts are far from clear. Nor is it an extraordinary case appropriate for extraordinary remedies.

To the extent the order remedies the violations of § 8(a) (1), it will be enforced; to the extent the order imposes a present duty to bargain, enforcement is denied.

Order enforced in part and denied in part.

37. See Bok, supra n. 35 at pp. 132–139; NLRB v. Flomatic Corp., 2 Cir., 347 F. 2d 74. In *Flomatic*, the question was considered in terms of the relation of the unfair labor practices to the good faith doubt of the employer of the union's majority. In any event, the decision that there was no such relationship if the unfair labor practices are not "flagrant" and that the bargaining order should not be enforced in that case, supports our conclusion here.