### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### ERTEL MANUFACTURING CORPORATION, Respondent.

#### No. 15062.

United States Court of Appeals Seventh Circuit.

Oct. 19, 1965.

Rehearing Denied Nov. 30, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Hans J. Lehmann, Atty., N. L. R. B., Washington, D. C., for petitioner.

Harry P. Dees, Joseph A. Yocum, Evansville, Ind., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

The Labor Board petitions for enforcement of its order issued against respondent and dated June 5, 1964.[1] Respondent (Company) maintains a factory and place of business in Indianapolis, Indiana, where it is engaged in the business of manufacturing and selling automotive parts.

The Union involved is the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL–CIO, hereafter called the Union.

The Labor Board adopted the Trial Examiner's findings and decision holding the Company had violated Section 8 (a)(1) of the Act by 1) enforcing an invalid no-distribution rule; 2) attempting to prevent solicitation upon behalf of the Union during non-work time; 3) threatening employees with the loss of benefits, discharge and plant closure if the Union were to obtain representation

---

1. The Labor Board's decision and order are reported at 147 N.L.R.B. No. 39.

**918**

rights, and 4) threats of discrimination and plant closure if the wearing of Union buttons and other Union activities continued. The Board also found the Company had violated Section 8(a) (3) and (1) of the Act by laying off a group of six employees on May 15, 1963, a group of twenty-one employees on May 29 and May 31, 1963, and by laying off, suspending and demoting individual employees on various other dates.

The Company had approximately 350 employees. They worked in eleven departments under the supervision of general superintendent Enochs. General foreman Carr was in charge of seven of these departments containing approximately 210 employees. The Company operated a day and night shift in the production and aluminum piston departments. In the latter department, twenty-one of the forty-seven employees were on the night shift.

When the Company hired a new employee, he was introduced to one of three men—Zigler, Longworth or Aurs. These men gave work assignments each day to the employees working on their shift. Each of the three also issued reprimands.

 On the basis of these facts, the Board found, in accord with the Trial Examiner, that Zigler, Longworth and Aurs were supervisory employees as defined by Section 2(11) of the Act. Whether an individual is a "supervisor" within the meaning of Section 2(11) is a question of fact and, as such, will not be overturned on review if supported by substantial evidence. Journeymen Plasterers' Protective and Benevolent Society, etc. v. N.L.R.B., 7 Cir., 341 F.2d 539. We feel the record contains substantial evidence to support the Board's finding on this question.

The officers of the Company were aware of the Union's organizing campaign. On April 30, 1963, the Union conducted an organizing meeting of the day shift employees and two days later, of the night shift men. At each meeting, employees signed authorization cards and were given a pin containing a legend "Join U A W Vote." Those who agreed to become members of the organizing committee were given a slightly larger pin containing the same legend with the additional words "Organizing committee." At these meetings and subsequent meetings held each week, authorization cards were distributed to the employees to obtain additional signatures. The Union instructed that such solicitations should be made during lunch periods and other non-work time. About half of the employees openly wore the respective buttons during working hours.

The Company had in effect certain shop rules. Rule 22 stated: "Soliciting or collecting contributions for any purpose whatsoever on Company time, without the specific approval of Management" and Rule 23 "Distributing literature, written or printed matter of any description on Company premises, without the specific approval of Management." At the end of the rules appeared—"The commission of any of the above infractions will be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge, depending upon the seriousness of the offense in the judgment of the Management."

On May 3, 1963, superintendent Enochs called employee Sweet to his office and told him he was "subject to immediate dismissal" for passing out "illegal literature." Enochs read Rules 22 and 23 to him. Sweet replied the only thing he had ever distributed was union authorization cards. Such activity had been limited to hours before work and during his lunch break. On May 16, the Company suspended Sweet for passing out "illegal literature" on its parking lot.

On May 15, 1963, Sweet and employee Cecil Russell were in the aluminum department about fifteen minutes before work time. Supervisor Zigler approached and told Russell "put those g—— d—— cards out of sight." Sweet advised Zigler that employees had the right to solicit for the Union on their own time. Zigler replied "It's not my rule. It's the Company's."

Employee Cloyd solicited authorization cards, mostly in the Company parking lot

after he had finished work. He solicited occasionally on his own time in the factory. Superintendent Enochs asked Cloyd if he knew he was subject to immediate discharge and then read Rules 22 and 23 to him. Enochs told Cloyd if he were caught violating these rules, he would be dismissed.

After May 3, 1963, employee Greer wore his union button and his organizing committee button. Supervisor Aurs told him the Company would cut hours of work to offset any increase the Union might obtain. He asked Greer if he didn't enjoy his Christmas bonus and extra four hours a week. Aurs said "I see you're still wearing your badges. You must have plenty of money or don't want no job."

In the early part of May 1963, supervisor Longworth told employee Pemberton that if the Union got in, all employees would be able to fish all summer.

Employee Beck started to wear his union button about May 7. Supervisor Longworth told him if he continued to wear the button, he would probably be out of work before the month was up. He also said that if the Union got in, the Company would just close its doors.

On the morning of May 15, 1963, supervisor Zigler told employees Sweet, Ramsey, Mobley, Holliday, Smith and Helton that they were all to go home and call back after 7 a. m. on May 17. It was plant superintendent Enochs who pointed out to Zigler which employees were to be sent home. All of these men except Ramsey were members of the union organizing committee. On their way out, they came through the section of the production department where employee Greer worked. Foreman Aurs, who had been heckling Greer about his union activities, told Greer—"there goes some more of your union buddies, going out, you see." The men reported back to work the following day.

The Company claims the men were sent home because the motor on one of the air compressors was not working properly.

However, the Board found that the air compression on that date was approximately 95 to 100 pounds, whereas the normal operating pressure was between 80 and 100 pounds. Furthermore, employees Sweet, Smith and Mobley were working at the time on machines which did not require air pressure.

The Company discontinued the night shift in the aluminum piston department on May 29 at about 8:30 p. m. A total of twenty-one employees were laid off, partly from the night shift and partly from the day shift.

In addition, the Company demoted two setup men to operators. Among the twenty-one laid off, seventeen were members of the Union and thirteen were members of the organizing committee. The employees had not been warned about the pendency of the layoff. Zigler stated that "lack of work" was the reason.

On May 16, the Company sought quotations from another company for the production of alloy aluminum pistons. It requested bids in lots from 500 to 1000 on some items and up to 5,000 on others. The Company received more than 10,000 pieces on June 3, an additional 17,333 pieces on June 20, and more than 15,000 pieces on July 10. The daily production of pistons manufactured by the Company on the day shift amounted to approximately 3,000 pieces.

The Labor Board concluded that the Company had violated Section 8(a)(1) of the Act by the promulgation and implementation of its no distribution law, by extending its rule against solicitation on Company time to cover such activity on the employee's time, and by supervisors Aurs' and Longworth's threats of reprisals against supporters of the Union.

The Board further concluded that the Company violated Section 8(a)(3) and (1) of the Act by 1) the layoff of six employees on May 15, 1963; 2) of twenty-one employees on May 29 and May 31, 1963; 3) the suspension of Sweet for one week and his demotion from set-

up man to operator on May 31; 4) the layoff of Beck from May 21 to May 27; 5) the discharge of Plymate on May 17, and 6) the demotion of Cloyd on June 24, 1963.

■ The Board's findings as to the reason for the layoffs and discharges are supported by substantial evidence in the record as a whole and we must accept them. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Symons Mfg. Co., 7 Cir., 328 F.2d 835, 837.

■ It is well established that an employer's rule which bars union solicitation by employees during non-working time or distribution of union literature during non-working time in non-working areas, in the absence of unusual circumstances, violates Section 8(a) (1) of the Act. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; Time-O-Matic, Inc. v. N. L. R. B., 7 Cir., 264 F.2d 96, 100. We hold there were no unusual circumstances in the instant case.

The Company argues that the fact that some of the laid-off employees were subsequently reinstated, demonstrates that the layoffs were not motivated by the employees' union activities. However, the Board found the motive and purposes of the layoffs were "to scotch the lawful measures of the employees before they had progressed too far toward fruition." That is, before the Union obtained a majority in the plant. The fact is, the Union did not obtain a majority. Hence, the reinstatement of some of the layoffs at a later date does not disprove the illegal intent of the Company at the time of discharge.

The discharge of employee Plymate presents a close question. The Company's warehouse was burglarized by an ex-employee who had been discharged by the Company and who, earlier in the evening, had borrowed twenty-five cents from Plymate in order to purchase cigarettes. It was Plymate's testimony that the ex-employee told him that a man owed him $10 and, at his request, Ply-

mate drove the ex-employee to a part of the city with which he was unfamiliar. In fact, he drove to a place near the warehouse, and a burglary was committed.

■ This story might seem improbable, but it is undisputed the Police Department closely questioned Plymate and he was not arrested nor detained in any manner. He was never charged with any crime with reference to the event. He explained the matter to superintendent Enochs and then went to work. However, ten days to two weeks later, he was discharged. We sustain the findings of the Board that Plymate was discharged because of his Union activities.

The Board ordered the Company to cease and desist from engaging in the unfair labor practices found to have been committed. The order requires the Company to offer reinstatement with back pay to ten piston department employees who were laid off, and also the same relief to employee Plymate; further, to make whole the six employees who were laid off on May 16 for loss of pay suffered; to make whole eight employees for loss of pay suffered by other layoffs and demotions, and to post appropriate notices to this effect.

The Board dismissed the complaint insofar as it alleged violations of Section 8(a) (1) of the Act by reason of certain actions of the Company's president and supervisors Longworth and Zigler. It also dismissed the complaint for alleged violations of Section 8(a) (3) and (1) of the Act by the layoff of employee Lay and the discharge of employee Greer.

■ We hold substantial evidence on the whole record supports the Board's finding that the Company interfered with, restrained and coerced its employees in violation of Section 8(a) (1).

■ We hold also that substantial evidence on the whole supports the Board's finding that the Company violated Section 8(a) (3) of the Act by laying off two groups of employees for union membership and activity, and by laying off,

demoting and discharging individual employees for the same reason.

As the Board's order is valid, a decree will be entered enforcing such order in full.

Order enforced.