PEOPLES SERVICE DRUG STORES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16861.

United States Court of Appeals Sixth Circuit.

April 5, 1967.

Charles R. Iden, Akron, Ohio, for petitioner.

Paul J. Spielberg, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Attorney, N.L.R.B., Washington, D. C., on brief, for respondent.

Before PECK and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

Peoples Service Drug Stores, Inc., petitioned the Court to review and set aside an order of the National Labor Relations Board issued against it on September 28, 1965. (Section 160(f), Title 29, U.S.C.) The Board's Decision and Order are reported at 154 NLRB No. 118. The Board in its answer seeks enforcement of the Order.

Peoples Service Drug Stores, Inc., hereinafter referred to as Peoples, operates a chain of drug stores in the greater Akron area of Akron, Ohio. Retail Clerks International Association, Local 698, AFL-CIO, hereinafter referred to as the Union, began a campaign for the organization of the employees of Peoples in April, 1964. Peoples was opposed to union organization. This was made clear in a meeting Richard J. Weaver, District Manager, had with the store managers on May 7th. He directed them to interview each of their employees and to emphasize the existing benefits of their employment and to point out the burdens of union membership. He gave them a list of "dos" and "don'ts" (General Counsel's exhibit No. 4) that they could use in discussing union organization with the employees.

The Board adopted as its order the recommended order of the Trial Examiner. The Trial Examiner found fourteen violations of Section 8(a) (1) of the Act. (Section 158(a) (1), Title 29, U. S.C.) These all involved statements made by store managers to employees. One of these concerned coercively interrogating Mary Davidson about her attendance at union meetings. The others were in connection with statements made by store managers, either to or in the presence of employees, to the effect that employees would be discharged, part time help would be eliminated, current benefits would be withdrawn, some advantageous working conditions would be eliminated, Peoples would sell its stores, etc., if the Union became the bargaining agent.

It is not denied that these statements were made by the managers or that they would constitute violations of Section 8 (a) (1) of the Act. It is claimed on behalf of Peoples that these statements were made by store managers in opposition to an effort to organize them and that they were not made under authority of top management. There had been an effort to organize the pharmacists of the area but the Trial Examiner found that it had been abandoned and was not being carried on at the time the campaign to organize the employees was being conducted. The managers of the stores were pharmacists and had been invited to join the Union. Being objects of union organization, they had a right to express their opinion. The Board claims that they went further than the mere expression of opinion and expressed company policy.

The Trial Examiner found that the evidence did not support this claim of Peoples. We agree. There was substantial evidence to support the findings of the Trial Examiner that the statements of the store managers were made to discourage the employees from joining the Union, a right guaranteed by Section 7 of the Act. (Section 157, Title 29, U.S.C.)

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be

conclusive." Section 160(e), Title 29, U.S.C. See, Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284.

Peoples objected to the inclusion and exclusion of certain persons in the appropriate unit for collective bargaining as approved by the Board. At the hearing before the Trial Examiner, the General Counsel objected to a total of nine persons who were included in the unit. As the hearing progressed, the General Counsel withdrew his objections to six of these persons and only three persons are now involved in this alleged error. The Examiner found that Kunstek, at store No. 144, and Kelly, at store No. 235, designated as "Foods Managers" on Peoples' payroll, were supervisors and therefore not includable in the appropriate unit. By definition, "supervisors"[1] are not included in the term "employees,"[2] Sections 152(11) and (3), Title 29, U.S.C., and if Kunstek and Kelly were supervisors, they were properly excluded from the bargaining unit.

■ Whether an employee is a supervisor or not is a question of fact, and the Board's resolution of the issue is conclusive if supported by substantial evidence. N.L.R.B. v. Ertel Manufacturing Corporation, 352 F.2d 916 (C.A. 7), cert. den., 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208; Eastern Greyhound Lines v. N.L.R.B., 337 F.2d 84 (C.A. 6); N.L.R.B. v. Griggs Equipment, Inc., 307 F.2d 275 (C.A. 5); Northern Virginia Steel Corporation v. N.L.R.B., 300 F.2d 168 (C.A. 4). The evidence shows that they receive ten to twenty cents more an hour than other food counter employ-

ees, and that they participate in a bonus based upon the gross volume of the food counter business. This is in addition to the regular Christmas bonus received by all employees. These food managers interview applicants for jobs and, although their decisions are not final, their recommendations are generally followed by the store managers. The food managers instruct the employees in their duties, assign employees to their particular stations, and make up the weekly work schedules. If an employee desires time off or desires to switch assignments, such requests are made of the food managers, who sometimes decide the requests without consulting the store managers. The food managers are responsible for preparing the orders for food supplies, which are then, often routinely, reviewed by the store managers.

■■ Peoples does not deny that the food managers perform these functions, but claims that they are under the supervision and direction of the store managers and assistant managers, and hence are not "supervisors." The fact that one is acting under delegated authority and may have his decisions reviewed by a superior, does not mean that a person is not a "supervisor" if he performs any of the functions enumerated in the statutory definition of "supervisor." Eastern Greyhound Lines v. N.L.R.B., supra. We conclude that there was substantial evidence to support the Board's finding that Kunstek and Kelly were "supervisors" and hence not includable in the appropriate bargaining unit.

Peoples also objects to the inclusion in the unit of Charles Henderson. Charles Henderson was a part-time employee who worked in the place of his brother Jerry Henderson, while he was out sick. The Examiner included Jerry Henderson

1. "(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such au-

thority is not of a merely routine or clerical nature, but requires the use of independent judgment."

2. "(3) The term 'employee' shall include any employee, * * * but shall not include * * * any individual employed as a supervisor, * * *."

in the unit for the June 6th payroll period but not for the July 4th period. Charles Henderson was included in the unit for only the July 4th period. We conclude that his inclusion in the unit for the July 4th period is supported by the evidence.

On June 3, 1964, the Union wrote to District Manager Weaver that a majority of Peoples' employees in the Greater Akron area had designated the Union as their collective bargaining representative. The letter requested recognition, described the unit and proposed a meeting for June 9th. It was also proposed in the letter that the Union and Peoples have an impartial person check the Union's signed authorization cards against a company payroll list. Mr. Weaver responded to this letter on June 5th, as follows:

"Please be advised that this company has a good faith doubt that your union represents the majority of it's (sic) employees in any appropriate unit we must decline recognition.

"We suggest that you take your claim to the N.L.R.B. in order that it may hold a secret ballot election.

"Card checks to determine majority status have always proven unreliable. They can never be an alternative to the democratic process of a secret ballot election.

"Therefore, we must decline your suggestion for a card check."

The campaign for members continued throughout June and on June 24th the Union presented a letter at a Union meeting and requested the employees to sign it. The letter reads in part, as follows:

"We the undersigned employees, members of Retail Clerks Union Local No. 698, are in receipt of your letter dated June 5, 1964, in which you state that you have a good-faith doubt of our union's majority status, and decline recognition of same.

"We the undersigned wish to make it known to you that we have freely signed authorization cards of membership authorizing the Retail Clerks Union to be our collective-bargaining representative.

\*　\*　\*　\*　\*　\*

"The union representatives have suggested that in seeking a contract with our company we should use good judgment, and ask only for fair wages, fair hours, fair working conditions. \* \* \* We the undersigned subscribe to our union representatives suggestions \* \* \* and hereby adopt them as our proposal of a contract.

\*　\*　\*　\*　\*　\*

"We feel that our company's refusal to recognize our union is based on fear, mistrust, and misunderstanding that can only be relieved by a meeting between our company representatives and our union representatives.

"We ask that a meeting take place on July 15, \* \* \* We believe that such meetings can achieve an agreement that is at once both fair to the company and fair to the employees."

Additional copies of this letter were signed by other employees in the days following. Weaver received these letters about June 30th. Copies of the signed letters were also sent to Peoples' store managers. These letters were purportedly signed by seventy-three employees.

Mr. Weaver responded to this letter on July 6th and said that several of the signers had reported to the management that the letter did not state their true desires and that they signed the letter under persuasion of other employees. Mr. Weaver said further that Peoples was still not satisfied that the Union represented a majority of the employees. It was suggested that the Union resort to the Board to have the issue determined. In August a letter was written on behalf of Peoples to all of its employees. They were reminded that at no time had the Union requested the Board to hold an election. It was stated in the letter that Peoples had filed a petition with the Board requesting an election. The letter further states, "All we have ever wanted was an election \* \* \*.

How much longer will the Union continue to block your right to vote?"

■ The Trial Examiner recommended and the Board found that Peoples violated Section 8(a) (5) and (1), (Section 158(a) (5) and (1), Title 29, U.S.C.) by refusing to recognize and bargain with the Union after June 3, 1964. Section 159(a) provides,

"Representatives designated or selected for the purposes of collective bargaining by a majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining * * * "

It is provided in Section 159(c) (1) (B) that if upon a hearing the Board finds that a question of representation exists, "it shall direct an election by secret ballot and shall certify the results thereof." If a company has a good faith doubt that a Union has authorization cards signed by a majority of the employees, the Board should not order the employer to recognize the union but should order an election. Whether an employer entertained a good faith doubt as to a union's claim that it represented a majority of his employees is a factual issue to be decided on the facts presented in each particular case. Appellate courts, in reviewing the facts of particular cases in order to determine whether there is substantial evidence to support findings of employers' lack of good faith, have both reversed and affirmed Board orders. In the following cases the Courts, contrary to Board determinations, have found that there was a good faith refusal to extend recognition. Pizza Products Corporation v. N.L.R.B., 369 F.2d 431 (C.A. 6); N.L.R.B. v. Great Atlantic & Pacific Tea Co., 346 F.2d 936 (C.A. 5); Fort Smith Broadcasting Co. v. N.L.R.B., 341 F.2d 874 (C.A. 8); Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754 (C.A. 2). The following cases affirmed the Board's findings of lack of good faith. N.L.R.B. v. Cumberland Shoe Corporation, 351 F. 2d 917 (C.A. 6); N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (C.A.

6), cert. den., 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74; N.L.R.B. v. Philamon Laboratories, Inc., 298 F.2d 176 (C.A. 2), cert. den., 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498; N.L.R.B. v. Trimfit of California, 211 F.2d 206 (C.A. 9).

■ The specific question before us is whether there was substantial evidence to support the finding of the Trial Examiner that there was no foundation for Peoples' alleged doubt that the union had a majority of its employees who desired representation by the union. The mere fact that Peoples was guilty of unfair labor practices in connection with the union organizational campaign is not sufficient in and of itself to negative a doubt on the part of management. Edward Fields, Inc. v. N.L.R.B., supra; N.L.R.B. v. Dan River Mills, Inc., 274 F.2d 381 (C.A.5); N.L.R.B. v. Hannaford Bros. Co., 261 F.2d 638 (C.A. 1).

■ The Examiner argues that if the management of Peoples had any doubt that the Union had a majority, a card check would have resolved that issue. We do not think this necessarily follows. A check of union authorization cards, allegedly signed by a majority of employees, is not necessarily determinative. An employer need not require a card check where he has a reasonable basis for believing that the cards do not reflect the uncoerced choice of his employees or that the employees signed the cards under a mistaken notion as to their full import. N.L.R.B. v. Flomatic Corporation, 347 F.2d 74 (C.A. 2); N.L.R.B. v. Great Atlantic & Pacific Tea Company, supra; N.L.R.B. v. Johnnie's Poultry Co., 344 F.2d 617 (C.A. 8); N.L.R.B. v. Koehler, 328 F.2d 770 (C.A. 7). The procedure of determining the majority status of a union by presentation of individually solicited authorization cards rather than by vote in a Board supervised election, has been described as a " 'notoriously unreliable method of determining majority status of a union' ". N.L.R.B. v. Flomatic Corporation, supra. See also, Pizza Products Corp. v. N.L.R.B., supra.

A significant number of employees testified that they signed the cards believing that their only effect would be to require a secret election under the auspices of the N.L.R.B. Some employees testified that union organizers and fellow employees soliciting union membership stated that the effect of signing the authorization cards would be to secure an election in which they would be free to vote for or against the union. The union and its organizers did not make known to all the employees that by presenting cards from a majority of Peoples' employees they could obtain recognition without an election. It appears from the testimony of a significant number of employees that they were mislead by union organizers or fellow employees acting on behalf of the union into believing that the only purpose of signing the cards was to obtain an election. An important factor to be considered in determining whether an employer entertained a good faith doubt as to the union's majority status is whether the union misrepresented the purpose of the cards to the employees.

> "The decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the langauge set forth in the cards. If in fact misrepresentations are made by the union to employees to the effect that the only purpose of the card is to authorize the union to petition the Board for an election, the card will not be construed to authorize representation, even though it contains language to that effect. N.L.R.B. v. Koehler, 328 F.2d 770 (C.A. 7); Englewood Lumber Company, 130 N.L.R.B. 394." N.L.R.B. v. Winn-Dixie Stores, Inc., supra.

See also, N.L.R.B. v. Cumberland Shoe Corporation, supra; Pizza Products Corp. v. N.L.R.B., supra; N.L.R.B. v. Gorbea, Perez & Morell S.En.C., 300 F.2d 886 (C.A. 1). Other employees stated that they were pressured into signing the cards and were promised that the Union would waive its initiation dues for all employees who signed prior to recognition. Several of these employees made these views known to their managers and to Mr. Weaver. Management could not know how widespread these views were. The Board's retrospective determination that the authorization cards of a majority of the employees were valid, does not necessarily negative an employer's good faith doubt at the time he refused recognition. Mr. Weaver testified that in nine other cases where a card check was refused and an election held, the Union lost the election. In N.L.R.B. v. Cumberland Shoe Corporation, supra, the company had no prior experience with elections or efforts to organize the employees. Previous experience with card checks and union elections, is a factor which must be considered in determining the good faith doubt of an employer. N.L.R.B. v. Hannaford Bros. Co., supra. The evidence demonstrates that Mr. Weaver had good reason to believe that not all the cards were reliable.

We do not find, as claimed by the examiner, that anyone on behalf of Peoples ever conceded that the Union had a majority of signatures of the employees. The Examiner says that the widespread coercion indulged in by Peoples compels the conclusion that the advocacy of an election was a device to undermine the Union and to gain time and that its expressed doubt as to a majority was not made in good faith. This is pure supposition and, unlike N.L.R.B. v. Cumberland Shoe Corporation, supra, we do not find evidence to support such an inference.

The Examiner discredits Mr. Weaver's reasons for doubt. The Examiner assumes that the employees who told management that their cards did not represent their true intentions, did so to avoid the displeasure of their employer. It may as well be assumed that they were pressured into signing by fellow employees and union representatives. This is not a criminal case where Mr. Weaver must be persuaded beyond a reasonable doubt. An honest doubt is

all that is required. A doubt in the mind of an individual is a subjective matter and cannot be precisely determined. While the absence of a doubt may be proved by circumstantial evidence, we conclude that, under the facts of this case, the Examiner's finding that Mr. Weaver, on behalf of Peoples, did not have a good-faith doubt is not supported by substantial evidence.

We grant enforcement of the Board's order, except as to the requirement to bargain collectively with the Union.