**TEXTILE WORKERS UNION OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Hercules Packing Corporation, Intervenor.**

No. 135, Docket 31207.

United States Court of Appeals
Second Circuit.

Argued Oct. 25, 1967.

Decided Dec. 7, 1967.

Daniel B. Jordan, New York City (Allan Sloan, New York City, on the brief), for petitioner.

Dwight Campbell, Jr., Buffalo, N. Y. (Jaeckle, Fleischmann, Kelly, Swart & Augspurger, Buffalo, N. Y.), for Intervenor.

Lawrence M. Joseph, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert S. Hillman, Atty., Washington, D. C.), for respondent.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The Textile Workers Union petitions for review of a decision of the National Labor Relations Board, 163 NLRB No. 35, that Hercules Packing Corporation did not violate § 8(a) (5) of the Act when it refused to recognize the union as the bargaining agent for the 78 maintenance and production workers[1] at its Alden, N. Y. plant on the basis of the union's claim that it held authorization cards signed by a majority of the employees. The ground for the decision was that General Counsel had not sustained the burden, which the Board considered to rest upon him, of negating the employer's claim of good faith doubt of the union's majority status.

The organizing campaign, begun in mid-August 1965, had progressed with sufficient speed that by September 2 organizer Ryan, accompanied by union vice president Richards, went to the plant, met with company president Rueger, claimed that a majority of the employees in the unit had signed authorization cards, and demanded recognition. Rueger rejected the demand, stating "You say you represent a majority of the

---

1. An additional employee was hired during the organizing campaign.

people. Well, I have heard that before. And apparently it wasn't true then, and I'm not sure it is true now." He refused an offer to examine the cards, referring Ryan instead to the company's lawyer, Campbell, who handled all its labor problems. Rueger promptly telephoned Campbell who then called Ryan. The latter renewed his demand for recognition and his offer to exhibit the cards. Campbell refused, saying he did not believe in card counts because "something" might later come up to "embarrass us," but expressed willingness to consent to an early election. Claiming that he was exceptionally busy, he said he would rather not file a petition for an election, but asked Ryan to file one and promised he would consent to an early vote. The union did file and, at a September 7 meeting at the Board's Buffalo office, both sides agreed to an election on September 16. In the course of the meeting Ryan made a final demand for recognition without an election and Campbell remarked, "Look, you have had two years to be signing these employees up in gin mills, and I need a week to turn them around";[2] it is unclear whether this was said in response to Ryan's demand or was part of the discussion concerning the date for the election.

During the ten day campaign period the company sent each employee two letters arguing against the union, and Rueger addressed both shifts on September 14 to the same purpose. The union lost the election 53–22, but petitioned to have it set aside, which the Board did, finding that certain portions of Rueger's speech exceeded the permissible bounds of campaign propaganda. A new election was ordered but the union withdrew its election petition after filing the charges that led to the decision here under review.

The Trial Examiner upheld the union's complaint that Hercules had violated § 8(a)(5) of the Act, since on his view it had a majority of valid authorization cards and the company had not proved it doubted this in good faith. He held also that three portions of Rueger's campaign speech were coercive and violated § 8(a)(1). The Board adopted the Trial Examiner's conclusions as to § 8(a)(1), a ruling which Hercules has not challenged, but declined to accept his recommendation as to § 8(a)(5).

The Board acted well within its powers in ruling that the general principle whereby the General Counsel carries the burden as to all elements of an unfair labor practice charge, cf. NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2 Cir. 1965); NLRB v. Majestic Weaving Co., 355 F.2d 854, 859 (2 Cir. 1966), applies also to the issue of good faith doubt once the employer has raised it, even though this requires the General Counsel to prove a negative. Indeed, it is not clear that the union argues otherwise; rather it contends that no substantial evidence supports the Board's conclusion that the General Counsel had not made out his case on the facts here presented.

The union argues first that Hercules did not make a sufficiently clear and unequivocal statement of its doubt when the union demanded recognition. But the law does not require the employer to express this by reciting any set formula, see NLRB v. River Togs, Inc., 382 F.2d 198 (2 Cir. 1967). Rueger's statement of disbelief in the union's majority status was a sufficient expression of doubt to negate any claim that this was an afterthought. While attorney Campbell's statement to Ryan on the telephone was more equivocal, the Board was justified in believing that, taken at its worst, it did not undermine his client's explicit language. The Board was even more clearly warranted in refusing to attach the sinister meaning urged by the union to Campbell's statement that he needed a week to turn the employees around. The context makes it far more likely that this was said in connection

---

2. In fact the first group of cards had been obtained at a meeting at a tavern. The Trial Examiner found that "Although some of the employees had drunk beer before the meeting opened, none of them drank any beer during the meeting."

with the date on which the election would be held, which was the dominant concern of the September 7 meeting, than in response to the union's renewed demand for a recognition it knew would not be forthcoming. Experienced labor attorneys do not ordinarily choose the Board's offices as places for the commission of unfair labor practices. Campbell's demand for an adequate period to present Hercules' side of the story to its employees by no means compels the inference that the company believed the union had a valid card-count majority; it could equally manifest a desire to keep a majority convinced that unionization was not in their best interests. Even the phrase about turning the employees around is entirely consistent with an intention to appeal to employees who had signed cards on the basis of misrepresentations that these would have no effect unless confirmed by an election, as was the case with a number of the signers here.

There is equally little force in the union's argument that an employer cannot be held to have a good faith doubt when he rejects an offer allowing him to examine authorization cards or to have a disinterested person do so. There is no need to cite the many cases in this court and others where a union with a majority of authentic cards has been found to lack a valid majority. Yet examination of the cards goes to only one element necessary to the union's majority status; it shows nothing on the equally important factor of how the cards were obtained. People's Service Drug Stores, Inc. v. NLRB, 375 F.2d 551, 556 (6 Cir. 1967). For an employer to say in effect, "I will concede you may have a majority of signed cards but I distrust their validity," is in no way inconsistent with good faith doubt.

If we should assume, which we do without deciding, that an employer relying on good faith doubt of a union's majority, while not bearing the ultimate burden of proof, must come forward with some evidence of a reason, that was done here. The Textile Workers had demanded recognition as bargaining agent for these same employees on the basis of authorization cards two years before. When the company rejected the demand, the union lost the ensuing election 40–25.[3] The Teamsters had made a similar demand and encountered a similar rebuff at the polls two years earlier. While loss of an election by a union with an apparent card majority does not establish that the majority never existed, it is some evidence of this, especially if the loss was by a substantial margin; moreover if such a union then turns up with another card majority, the employer has reason to question whether this was validly obtained. The cases properly recognize that "Previous experience with card checks and union elections, is a factor which must be considered in determining the good faith doubt of an employer." People's Drug Stores, Inc. v. NLRB, supra, 375 F.2d at 557; see also NLRB v. Johnnie's Poultry Co., 344 F.2d 617 (8 Cir. 1965); Wausau Steel Corp. v. NLRB, 377 F.2d 369, 373 (7 Cir. 1967); and NLRB v. Hannaford Bros. Co., 261 F.2d 638 (1 Cir. 1958) (Magruder, J.).[4] These considerations have especial weight when, as here, the majority is slender on the union's own claim. Ryan at no time had the cards of more than 43 employees; indeed the Examiner found that when he made his first demand upon Rueger, he had only 39 cards in his possession—one less than needed for a majority even if all the cards were valid.

---

3. At that time the rule of Aiello Farms, 110 N.L.R.B. 1395 (1954), barred the union from asserting a violation of § 8 (a) (5) if it subsequently petitioned for a representation election. The Aiello decision was reversed in Bernel Foam Products Co., 146 N.L.R.B. 1277 (1964).

4. NLRB v. Overnite Transportation Co., 308 F.2d 279 (4 Cir. 1962), is not to the contrary. The fact that the employer in that case sought to justify his refusal to recognize the union's card majority because of his prior experience with authorization cards at *other* locations affords a possible basis for distinction; moreover, the court found other evidence indicating that the employer credited the union's claim of majority support.

The union's argument that Hercules' communications to its employees during the election campaign prove that it never doubted the union's card majority is likewise without merit. The use of campaign speech as evidence to infer bad faith at an earlier time is a hazardous business as we pointed out in NLRB v. River Togs, Inc., supra, 382 F.2d at 206-207; since votes may be gained or lost during a campaign, presenting anti-union arguments affords no logical basis for belief that the employer did not doubt the card majority. See Wausau Steel Corp. v. NLRB, supra, 377 F.2d at 372-373; NLRB v. Hannaford Bros. Co., supra; Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851, 854–856 (1967). While the three portions of Rueger's speech that the Board found to be violations of § 8(a) (1) do indicate that Hercules wanted to win the election, they cast no shadow on its good faith doubt before the campaign began. A paragraph in one of the two campaign letters stating that Rueger refused to recognize the union on its card majority because the company's lawyer "advised that an NLRB supervised election was the only fair and certain way to determine whether employees wanted this union" is likewise inconclusive. One excellent reason why an employer might think "an NLRB supervised election" to be "the only fair and certain way to determine whether employees wanted" a union would be knowledge of the manner in which authorization cards have often been obtained. Indeed, another paragraph of the very letters here challenged can be read as indicating that Hercules refused to trust in the union's card majority because of its past experience.

Our discussion of the facts of this case demonstrates how far removed they are from those in Retail Clerks Union Local No. 1179 v. NLRB, 376 F.2d 186 (9 Cir. 1967), upon which the union heavily relies, where a divided court reversed the Board's finding of good faith doubt in John P. Serpa, 155 N.L.R.B. 99 (1965). The employer in that case never stated that he doubted the validity of the cards, and he had no prior experience giving him cause to do so. Indeed, the court indicated that its decision might have been different if the employer had expressed a bona fide doubt. Id. at 189. The facts in NLRB v. Johnnie's Poultry Co., supra, are nearer those in the instant case. The employer there had refused an earlier demand for recognition on the basis of a substantial card majority; the union lost the ensuing consent election 41–27. A year later the same union forwarded photostats of the authorization cards of 49 of the 93 employees in the unit and made a demand for recognition. The company refused, simply stating that "we do not recognize the copies of the cards you sent us as a reliable indication of the present desires of our employees." The court refused to enforce an order finding the company in violation of § 8 (a) (5), holding that, given the company's previous experience with the unreliability of authorization cards as an index of employee sentiment, there was no substantial evidence that its refusal to bargain was not motivated by good faith doubts of the union's majority. *Johnnie's Poultry* is *a fortiori* authority here where the Board has found in the employer's favor. We thus find it unnecessary to determine whether we would follow the majority or the dissenting judge in *Retail Clerks* upon the facts there presented.

Since the Board was thus justified in holding that General Counsel had failed to sustain the burden of negating Hercules' claim of good faith doubt of the union's status, we need not consider Hercules' impressive claim that because of misrepresentations of the solicitors the union did not in fact have enough valid cards to constitute a majority.

The petition to review is denied.