LANE DRUG CO., a Division of A. C. Israel Commodity Corp., Lane's of Sylvania, Inc., Lane's of Bowling Green, Inc. and Lane's of Oregon, Inc., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Retail Store Employees Union Local 954, etc., Intervenor.

No. 17466.

United States Court of Appeals Sixth Circuit.

March 29, 1968.

---

Leonard Lane and Alan Arnold, Cleveland, Ohio (Lane, Krotinger, Santora & Stone, Cleveland, Ohio, on the brief), for petitioners.

Hans J. Lehman, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Attys., N. L. R. B., Washington, D. C., on the brief), for respondent.

Joseph E. Finley, Cleveland, Ohio (Metzenbaum, Gaines, Krupansky, Finley & Stern, Cleveland, Ohio, on the brief), for intervenor.

Before WEICK, Chief Judge, PHILLIPS, Circuit Judge, and McALLISTER, Senior Circuit Judge.

WEICK, Chief Judge.

The controversy in this case grows out of efforts to organize the pharmacists employed by Lane Drug Co., an Ohio corporation, and its three corporate affiliates, in seventeen drug stores [1] located in Toledo, Ohio and environs.

The union [2] sought to obtain recognition as exclusive bargaining representative of the pharmacists via the signed authorization card route rather than by means of a Board-conducted election.

The union representative attended a meeting of about twenty of the pharmacists which was called late in the evening

1. The eighteenth store, employing two pharmacists, was opened in Fostoria, Ohio, about two weeks after the union filed the unfair labor practice charge.

2. Retail Store Employees Union Local 954, Retail Clerks International Association, AFL–CIO.

of April 28, 1965, when sixteen pharmacists signed authorization cards.

The next day, on April 29, 1965, at 5:42 o'clock P.M., the union sent to Lane Drug Co. a telegram stating that it represented a majority of its pharmacists in greater Toledo and Bowling Green, Ohio stores, and requesting a meeting to negotiate a contract covering wages, hours and working conditions for all pharmacists in the above stores, except those who function in a supervisory capacity. The telegram was received by Lane Drug Co. on Friday, April 30th.

On the following Monday, May 3rd, the union, without waiting for a reply, filed with the Board an unfair labor practice charge against Lane, alleging a violation of Section 8(a) (5) of the National Labor Relations Act as amended, 29 U.S.C. § 151 et seq., for refusal to bargain, and also alleging a violation of Sections 8(a) (1) and 8(a) (3) of the Act. An amended charge was filed on June 11th.

On May 4th the union sent another telegram to Lane Drug Co. repeating its demand for recognition and offering to prove its majority through the facilities of an impartial third party, the Toledo Labor Management Citizens Committee.

Subsequent to the filing of a complaint, a hearing was conducted before the trial examiner, who rendered his decision holding that Lane and affiliated companies violated Section 8(a) (1) of the Act by interrogating their employees concerning their union activities or sympathies, by soliciting employees to survey and report to them the activities of other employees in behalf of the union, by promising benefits to pharmacist Nupp in order to have him discontinue his organizational activities, by attempting to deal with strikers on an individual basis, and by stating that the companies would not recognize any union. The examiner ex-

pressly found, however, that Lane did not threaten the pharmacists with discharge or reduced hours in reprisal for union affiliation or activities. The examiner further found that Lane violated Section 8(a) (3) of the Act by discharging pharmacist William P. Nupp, and violated Section 8(a) (5) of the Act by refusing to bargain with the union on April 29th and thereafter. He recommended that pharmacist Nupp be reinstated with back pay, that Lane be ordered to bargain with the union, and that appropriate notices be posted.

The Board, in reviewing the examiner's decision, upheld his findings as to Section 8(a) (1), 8(a) (3) and 8(a) (5) violations, but found that he was in error in holding that Lane violated the Act by refusing to bargain in response to the April 29th telegram, because on that date the union with only sixteen cards, did not in fact represent a majority of the appropriate unit of thirty-two pharmacists.[3] The Board held, however, that on May 4th, when the union repeated its demand for recognition, it had acquired an additional card and therefore had a majority of one; that Lane did not have a good faith doubt about this majority; and that Lane was therefore in violation of Section 8(a) (5) by refusing to bargain with the union. The Board pointed out a number of errors in the examiner's decision, which it termed "discrepancies", but held that they did not affect his ultimate conclusion or its concurrence therewith.

Upon consideration of the record as a whole, we agree that there was substantial evidence to support the Board's findings of Section 8(a) (1) violations in the respects hereinafter pointed out, and the findings with respect to the 8(a) (3) violation, but we do not agree that there was substantial evidence to support its finding as to a Section 8(a) (5) violation.

**3.** The Examiner had excluded from the bargaining unit pharmacists Waldman and Searle. The Board held that Waldman, a part time employee, should not have been excluded, and that Searle was properly excluded because of lack of com-

munity of interest with the other pharmacists. This was not the reason given by the Examiner. By excluding Waldman from the unit, the union lacked a majority.

Lane owned and operated a chain of fourteen drug stores in the Toledo area. Its affiliated companies, as indicated by their respective names, operated three additional stores in Sylvania, Bowling Green, and Oregon, Ohio. The eighteenth store was opened on May 18, 1965, at Fostoria, Ohio.

A stipulation was filed at the hearing before the examiner, to the effect that the four separate corporations constituted a single employer within the meaning of Sections 2(6) and (7) of the Act. This was because the corporations had substantially the same officers and directors, with the President and Vice Presidents exercising substantial control over their operations and having centralized purchasing, warehousing and payroll systems. The General Manager of the stores, Pethke, was stationed at Toledo and under him were two nonpharmacist supervisors, Wagenman and Willis, each supervising about one-half of the stores. In each store there was one manager and one assistant manager, some of whom were pharmacists, and some were not. A store manager and assistant manager work alternate shifts, so that one of them is in the store at all times.

Ohio law requires pharmacists to be graduates of a recognized school or college of pharmacy, to serve for one year as an intern in a drug store under the supervision of a registered pharmacist, and to pass an examination conducted by the State Board of Pharmacy, in order to obtain a Certificate of Registration. Ohio Rev.Code § 4729.08. The law further provides that a retail drug store shall be "in full and actual charge" of the registered pharmacist. Ohio Rev.Code § 4729.27.

The leader in the organizational movement was pharmacist Nupp, who had been in the employ of Lane since 1961. In the latter part of 1964 Nupp contacted a substantial number of the pharmacists, including pharmacist-managers and assistant managers, to ascertain whether they were interested in forming an organization to deal with the company concerning working conditions. He learned that there was considerable sentiment toward formation of some type of an organization, but there was a difference of opinion as to whether there should be a union "because of professional reasons".

Nupp testified that Vice President Kaye visited him twice at the store where he worked, shortly before Christmas of 1964. Kaye told Nupp that he knew of his organizational efforts and asked him the reason for such activity. Nupp detailed some of the complaints of the pharmacists and Kaye said he would discuss them with the men but that he thought they should bargain only on an individual basis. Kaye told Nupp that he liked him and would like him to become manager of a newly opened store, and that he would prefer that Nupp not continue his efforts to organize a union. Nupp said he was not interested in becoming a store manager. Kaye told Nupp, in a "cynical" tone according to Nupp, that he [Nupp] did not have to worry about losing his job for what he had done. At the second meeting Kaye repeated substantially the same statements but Nupp did not testify as to any cynicism in this conversation. Kaye added that a pay increase for Nupp could be arranged and that he also might obtain an interest-free loan.[4]

Kaye also interviewed pharmacist Eisenhauer and suggested that Kaye be called on the telephone any time a pharmacist had a grievance.

In January, 1965, Kaye suggested that Nupp write to the Cleveland office and request a $15,000-loan on his own terms. Kaye further told Nupp that he would look into the complaints and would discuss them with the pharmacists. He asked Nupp not to discuss any store problems with fellow employees, but to call him [Kaye] or Manager Pethke. Nupp told Kaye that what Kaye said

4. Nupp's home was mortgaged in the amount of fifteen thousand dollars. He was interested in obtaining a loan from the company in order to pay off his mortgage.

made him quite happy and that he was satisfied with Kaye's assurances.

After this meeting, Nupp discontinued his organizational activities, and in February, 1965, he made application by letter to the company for a $14,000-loan. In the letter he stated that he and his wife thought it would be more advantageous for them to remain in Toledo rather than go to California. Several weeks later Kaye told Nupp that the company would loan him only $4,500, which Nupp stated was satisfactory; but he nevertheless resumed his organizational activities. He and three other pharmacists held a meeting, at which he was authorized to contact local unions. Around April 10th General Manager Pethke told Nupp his application for a loan had been denied; that he [Nupp] was a trouble maker; and that Pethke would perfer that he leave the company. Nupp did not leave.

In the middle of April, Nupp contacted the union and arranged a meeting for the 28th of April. Eighteen to twenty pharmacists, including Assistant Manager Rettig, were invited to attend the meeting. There was some interrogation of two pharmacists by supervisors concerning the meeting. In one interrogation Supervisor Portteus told pharmacist Maza, "If I were you, I wouldn't get mixed up with this union activity that Bill Nupp is trying to start."

On April 28th, shortly before closing time around 9:30 p. m., Supervisor Willis discharged Nupp, giving as a reason that another pharmacist wanted to transfer to his store, said pharmacist having been a manager of Store No. 3. The discharge of Nupp was the subject of considerable discussion at the meeting of pharmacists held on April 28th, and undoubtedly had some impact on influencing the sixteen pharmacists to sign the union cards that evening.

After the two telegraphed demands of April 29th and May 4th, the filing of an unfair labor practice charge by the union on May 3rd, and other intervening activities by Lane and the union, Lane wrote to the union on May 12th expressing doubt as to its majority status; and on the same day Lane filed a representation petition with the Board for all pharmacists, except supervisors, employed by it at its drug stores in Toledo and vicinity.[5]

Another meeting of about twenty pharmacists was held on May 13th and they voted to go on strike, which strike lasted for about two weeks. Sixteen pharmacists picketed about ten drug stores. During the strike additional contacts were made with pharmacists by supervisors, requesting that they deal with management individually. The president of the companies wrote to the pharmacists suggesting that if they had problems they should talk with him directly, instead of through a go-between. He also stated that he would not talk to a union organizer or outsiders.

### Section 8(a) (1) Violations

██ The employer has a right to talk with his employees and to express his views as to whether or not they should join a union. Jervis Corp. v. NLRB, 387 F.2d 107 (6th Cir. 1967). This right of free speech prevails, however, only so long as the interrogation is noncoercive. NLRB v. Welsh Industries, Inc., 385 F.2d 538 (6th Cir. 1967).

██ The interrogation should be viewed in the context that the pharmacists were all college graduates, duly licensed to practice their profession. They had no difficulty in getting employment at drug stores. Some of them worked for other employers. In the light of this fact it is interesting to note that the examiner found that no pharmacist had been threatened with discharge or shortening of his hours of work. The burden was upon the General Counsel to prove that the interrogation was coercive. In

---

5. Lane's petition was later withdrawn. On August 18, 1965 another representation petition was filed in behalf of all four corporate employers. The Board denied this second petition on the ground that an unfair labor practice charge against the companies was pending.

our opinion he did not sustain that burden.

■ The pharmacists were, however, promised benefits if they would deal with the employer directly. The offer to pharmacist Nupp of a loan and an increase in salary is evidence of this. They were asked to prevail on other employees to deal directly with the employer. The employer told pharmacists that he would not deal with the union. The employer's conduct, in our opinion, constituted an interference with the employee's right to organize, guaranteed under Section 7.

We conclude that substantial evidence supported the Board's finding as to Section 8(a) (1) violations in the respects above noted. NLRB v. Universal Camera Corp., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Section 8(a) (5) Violation

■ The findings of violation of Section 8(a) (5) present the important question of whether the employer had a good faith doubt about the union's representation of a majority of employees when the demands of representation were made. If the employer had such a doubt it cannot be found guilty of unlawfully refusing to recognize the union, even though the union actually represented a majority of the employees. NLRB v. H & H Plastics Mfg. Co., 389 F.2d 678 (6th Cir. 1968); Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551 (6th Cir. 1967); Pizza Prods. Corp. v. NLRB, 369 F.2d 431 (6th Cir. 1966).

■ Contrary to the findings of the trial examiner and the Board that there was no reason for Lane to doubt the majority status of the union, we think that several bases for a good faith doubt, which have been judicially recognized, did in fact exist at the time Lane was found to have violated section 8(a) (5).

It is clear that the burden of proof was upon the General Counsel to establish the lack of good faith of Lane in refusing to bargain. NLRB v. River Togs, Inc., 382 F.2d 198 (2nd Cir. 1967); NLRB v. Great Atlantic & Pacific Tea Co., 346 F.2d 936, 939–940 (5th Cir. 1965); Aaron Bros. of Cal., 158 NLRB 1077 (1966).

The first basis for a good faith doubt is the fact that Lane officials, as a result of investigations after the first demand, had received indications from several of its pharmacists that "not many" of them were interested in the union. Supervisor Willis, who had been instructed to make the investigation shortly after the first demand, talked with pharmacists Yarnell, Newhard and Langdon, who had also talked with other pharmacists, and they advised Willis in substance that they did not think many of the pharmacists were interested in the union. Willis testified that these responses were typical of others which he received from pharmacists and store managers. Willis reported to the General Manager that only a few of the pharmacists were interested in the union; that a majority of them were not interested; and that some who signed indicated that they felt they should, or had to. This testimony was not controverted.[6]

■ A further reason for Lane to doubt the majority claimed by the union, not discussed by either the examiner or the Board, is the fact that on January 15, 1954, the same union had made a written demand to Lane for recognition as bargaining agent for some of its clerical employees, and represented that it had been designated and authorized by a majority of the employees. Lane petitioned the Board for an election, which the Board granted. The result of the election was that out of a total number of 191 eligible voters, the union received

6. The examiner summarized this testimony in his decision but he thought Willis was "unnecessarily evasive and vague about these conversations, incredibly testifying that he 'more or less listened to what they had to say about it' and that he 'didn't really do any questioning as to what took place.'" We see nothing vague, evasive, or incredible about the testimony of Willis concerning what the pharmacists had told him and his report to his superior.

only 28 votes, with 154 employees voting against the union. In determining the good faith of the employer, its previous experience with union cards or elections is a factor which is considered. Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551 (6th Cir. 1967); NLRB v. Johnnie's Poultry Co., 344 F.2d 617 (8th Cir. 1965); NLRB v. Hannaford Bros. Co., 261 F.2d 638 (1st Cir. 1959).

The union was interested in becoming collective bargaining representative of the pharmacists, if this could be accomplished without an election, and apparently in a hurry. The first telegram demanding recognition was sent after business hours on April 29th and was received by the company on Friday, April 30th. Although the company did begin an immediate investigation, the union did not wait for a reply, and on the following Monday it filed an unfair labor practice charge, alleging a Section 8(a) (5) violation for failure to bargain, along with violations of Sections 8(a) (1) and 8(a) (3). In light of the union's erroneous claim of a majority in 1954, and the hurried procedure of the union in attempting to gain recognition on this occasion, it was not unreasonable for Lane to look upon the union's claim of representing a majority of its pharmacists with skepticism, and these two considerations would provide further reason for a good faith doubt.

■ When the union made its first telegraphic demand, it did not have a majority. It was only by erroneously excluding from the unit a part time employee who the Board found should have been included, that the examiner was able to find a majority existed on April 29th. A few days later the union secured another card and made its second telegraphic demand, which the examiner and the Board both found gave the union a majority of one—a slim margin, indeed. The existence of a majority by a slim margin is also a factor which must be considered in determining whether a good faith doubt existed. NLRB v. Great Atlantic & Pacific Tea Co., supra. See also Pizza Prods. Corp.

v. NLRB, 369 F.2d 431, 438 (6th Cir. 1966).

■ Neither of the bargaining demands (the telegrams of April 29th and May 4th) clearly designated which stores or pharmacists the union claimed to represent. This lack of clarity was an additional reason for Lane to doubt in good faith that the union had the majority that it claimed. The two demands were addressed only to Lane Drug Company. While they mentioned Bowling Green, the demands were not addressed to Lane's of Bowling Green, Inc., which owned and operated the Bowling Green store. Nor were the demands addressed to Lane's of Sylvania, Inc., or Lane's of Oregon, Inc., which owned and operated stores in those cities. The employer was supposed, apparently, to divine whether the union intended to include them.

The Board ruled that all managers and assistant managers-pharmacists were supervisors and hence not includable in the bargaining unit. This was clear after the Board made the ruling, but it was not too clear at the time the demands for recognition were made. Ohio law seems to require that pharmacists be "in full and actual charge of * * * [the] store." Ohio Rev. Code § 4729.27. This would appear to require that the pharmacists on duty at the time be in charge of the store.

When a manager-pharmacist was relieved by his assistant, the latter was in charge of the store. None of the manager-pharmacists or assistant managers had power to hire or discharge employees, but they were authorized to make recommendations in that regard. The stores were all supervised by two general supervisors, Wagenman and Willis, who visited them daily. One pharmacist testified that the difference between a manager and a nonmanager was that the former had keys to the store and the latter did not. There was no difference in compensation.

One of the pharmacist-managers was invited to attend the organization meet-

ing of April 28. He must have been considered eligible to attend and participate in the union. There was substantial interchange of employees among the stores. There was the problem of whether part time pharmacists, pharmacist-interns, and pharmacists who were on sick leave, but who were still carried on the employer's books as employees, were eligible to be included in the unit. There was a question of eligibility of pharmacist Searle to be included in the unit. Searle was stationed at the warehouse, and his chief function was to order drugs, but he also served in stores as a pharmacist, in emergencies. There was also a question whether pharmacists who left the employ shortly after the demands, and pharmacists who were employed shortly thereafter in the newly opened store, should be included or excluded from the unit.

 In addition to demonstrating a further basis for a good faith doubt, all of these questions suggest that the best procedure to be followed in a case of this kind is a Board-conducted election, where the bargaining unit would be determined by the Board and the eligibility of employees fixed at one time, the date of the election. NLRB v. General Tube Co., 331 F.2d 751 (6th Cir. 1964).

 Under the circumstances of this case the employer is placed on the horns of a dilemma. If a majority exists and he refuses to recognize it, he violates Section 8(a) (5). This was the ruling of the Board in the present case. On the other hand, if the employer recognizes a union which does not in fact represent a majority, he violates Section 8(a) (1) and 8(a) (2). The Supreme Court so held in International Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), and held further that the employer's good faith was not a defense. Mr. Justice Clark, who wrote the opinion for the Court, said:

"More [than a Section 8(a) (2) violation] need not be shown, for, even if mistakenly, the employees' rights have been invaded. It follows that prohibited conduct cannot be excused by a showing of good faith." Id. at 739, 81 S.Ct. at 1608.

 It is contended that failure of the employer to accede to the union's offer for a check of authorization cards by a neutral third party, is proof of the employer's bad faith. This is not necessarily so. The use of such cards has been held by the Board to be a "notoriously unreliable method of determining the majority status of a union." Sunbeam Corp., 99 NLRB 546, 550, 551 (1952). An order to bargain, based thereon, has been described as "strong medicine" to be applied only "with restraint." NLRB v. Flomatic Corp., 347 F.2d 74, 78–79 (2nd Cir. 1965). The offer of a check of authorization cards "does not impose a duty upon the company to submit to the check or suffer the consequences of a refusal-to-bargain charge." NLRB v. Great Atlantic & Pacific Tea Co., 346 F.2d 936, 942 (5th Cir. 1965). See also NLRB v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967); Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551 (6th Cir. 1967); NLRB v. Johnnie's Poultry Co., 344 F.2d 617 (8th Cir. 1965).

 The fact that the employer committed unfair labor practices in violation of Sections 8(a) (1) and 8(a) (3) is not of itself sufficient reason to negative a good faith doubt. Peoples Service Drug Stores, Inc. v. NLRB, supra, 375 F.2d at 556. See also NLRB v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967). An 8(a) (1) violation without more is just as consistent with a disbelief in the majority status of the union as it is with a belief in the majority status. An order to bargain, based on an 8(a) (1) violation, will not be enforced. NLRB v. River Togs, Inc., 382 F.2d 198, 207 (2nd Cir. 1967); NLRB v. Flomatic Corp., 347 F.2d 74 (2nd Cir. 1965).

 Finally, the employer urges bias on the part of the trial examiner in his rulings at the hearing, in crediting the

testimony of witnesses of the General Counsel most of the time, and in crediting the testimony of the witnesses of the employer hardly any of the time, and also urges bias in the use of intemperate language in his decision. We have considered these claims, but in our judgment they are not sufficient to establish bias.

The order of the Board is enforced with respect to the Section 8(a) (1) violations, approved herein, and enforced with respect to the Section 8(a) (3) violation. Enforcement is denied with respect to the claimed Section 8(a) (5) violations.